MRS. LOUISE LEWIS NICHOLAS, Petitioner, v. MRS.
KATIE L. WRIGHT, Respondent. —301 S. W. (2d) 540.

Western Section.　May 18, 1956.

Petition for Certiorari denied by Supreme Court October 5, 1956.

John S. Montedonico, Memphis, and M. Watkins Ewell, Dyersburg, Canale, Glankler, Montedonico, Boone & Loch, Memphis, of counsel, for appellants, Katherine C. Prothro and Clifton B. Cates.

Lowell W. Taylor, Memphis, for appellee, Mrs. Louise Lewis Nicholas.

CARNEY, J. Mrs. Katherine C. Prothro and Major General Clifton B. Cates appeal from an order of the Chancery Court of Lake County overruling the exceptions filed by them to the report of Mrs. Louise Lewis Nicholas as guardian of Mrs. Katie L. Wright, now deceased. They contend that Mrs. Nicholas received gifts from Mrs. Wright totaling $136,150 during the period 1947 through 1951 and that said gifts were illegal and therefore that

Mrs. Nicholas should be required to account for the same. Mrs. Nicholas had not been appointed guardian at the time the gifts were made.

General Cates and Mrs. Prothro are brother and sister and are nephew and niece respectively of Mrs. Katie L. Wright, deceased. Mrs. Louise Nicholas is also a niece of Mrs. Wright and lived in the home with Mrs. Wright as a member of her household since she was about seven years of age and for a period of about forty years prior to the death of Mrs. Wright.

Mrs. Wright owned several thousand acres of very valuable farm land in Lake County, Tennessee, at the time of her death on August 8, 1953, at the age of ninety-three years. Mrs. Wright left no children or grandchildren surviving her and her closest relatives were nieces and nephews including the three parties involved on this appeal.

Mrs. Wright's husband died about 1912 and left considerable farm lands to Mrs. Wright which she managed very successfully and in addition she accumulated additional farm lands and personal property throughout the years. Two sons were born to her, both of whom died over thirty years ago leaving no children.

On January 28, 1953, Mrs. Wright was adjudged mentally incompetent by a jury and Mrs. Nicholas first became temporary guardian and then on April 1, 1953, she was appointed and qualified as regular guardian.

After the death of Mrs. Wright in August, 1953, the guardian filed a petition for approval of a final settlement as such guardian. The appellants, General Cates and Mrs. Prothro, filed exceptions to the approval of this final settlement alleging, in substance, that Mrs.

Wright had been incompetent for several years prior to her death and before the appointment of a regular guardian; that Mrs. Louise Lewis Nicholas had been living in the home with and managing all of the financial affairs of their aunt, Mrs. Wright, for several years and that Mrs. Louise Lewis Nicholas had received, during the course of this period, illegal gifts in the total amount of $136,150.

The exceptors, General Cates and Mrs. Prothro, contend that even if Mrs. Wright were mentally competent, yet the gifts were void nevertheless because obtained by Mrs. Nicholas at a time when she occupied a confidential relationship with Mrs. Wright.

The gifts received by Mrs. Nicholas which are under attack are as follows:

| | |
|---|---|
| During the year 1947 a total of | $ 19,650.00 |
| During the year 1948 a total of | 75,500.00 |
| During the year 1949 a total of | 10,000.00 |
| During the year 1951 a total of | 31,000.00 |
| | |
| Total gifts of cash and bonds | $136,150.00 |

The gift taxes paid by Mrs. Wright on the above gifts to Mrs. Nicholas amounted to $18,041.10.

The exceptors also contend that Mrs. Nicholas received title to two parcels of real estate in Tiptonville which were purchased with funds belonging to Mrs. Wright. The deeds to these parcels of property were made to Mrs. Nicholas who in turn conveyed a life estate to Jim Taylor, the Negro cook who had worked for Mrs. Wright for some forty years, and a life estate in the other to Eugene Hicks, the Negro man who had worked for Mrs. Wright

during the last eight or nine years as chauffeur, house boy, etc.

We agree with the insistence of appellants that there was a confidential relationship existing between Mrs. Nicholas and Mrs. Wright. For several years prior to Mrs. Wright's death Mrs. Nicholas handled a large portion of Mrs. Wright's business including the receiving and disbursing of money, collection of farm rents and management of farm property. Bayliss v. Williams, 46 Tenn. 440; Miller v. Proctor, 24 Tenn. App. 439, 145 S. W. (2d) 807.

Upon the evidence in the record we concur in the finding of the Chancellor that Mrs. Wright was mentally competent at the time these gifts were made during the period from 1947 through 1951.

Since we have found that the gifts were received by Mrs. Nicholas during the period when she occupied a confidential or trust relationship toward Mrs. Wright, a court of equity must review such transactions with the strictest scrutiny.

From the case of Miller v. Proctor, 1940, 24 Tenn. App. 439, 145 S. W. (2d) 807, at page 811, we quote as follows:

"(4) The existence of such a relation between two persons does not of course prevent the one who is dependent upon the other from giving him his property; but such relation does raise a presumption of the invalidity of such a gift, and the burden is upon the donee to show by the 'clearest and most satisfactory evidence to be adduced, that at the time the transaction took place, no advantage whatever was taken, either of the confidential relations exist-

ing in order to obtain a benefit, or of the weakness and frailty of the party from whom the benefit was received.' Graves v. White,. 4 Baxt. 38, 41, 63 Tenn. 38, 41. In Pomeroy's Eq. Jur. it is said: 'The transaction is not necessarily voidable, it may be valid; but a presumption of its invalidity arises, which can only be overcome, if at all, by clear evidence of good faith, of full knowledge and of independent consent and action.' (Citing many cases.) Vol. 2, sec. 957, pp. 2042, 2043.

"(5) It is held in many jurisdictions that where a confidential relationship exists the donee must show not only that no undue influence was used and the gift was understandingly and voluntarily made by the donor, but also that he had the benefit of competent and independent advice of a disinterested third party. See cases cited in annotations, 16 L. R. A., N. S., 1088, 15 Ann. Cas. 1033; 24 Am. Jur. 757.''

This rule has been reannounced in subsequent cases including Roberts v. Chase, 25 Tenn. App. 636, 166 S. W. (2d) 641; Turner v. Leathers, 1950, 191 Tenn. 292, 232 S. W. (2d) 269; Black v. Pettigrew, 1953, 38 Tenn. App. 1, 270 S. W. (2d) 196.

When we review the evidence in the instant case concerning these gifts which are under attack in the light of the foregoing decisions we find the following evidence:

Soon after Mrs. Wright became a widow about 1912, her sister, Mrs. Lewis, together with her young daughter, Louise, then aged about seven years, came to make their home with Mrs. Wright. Mrs. Lewis had little or no money and Mrs. Wright paid all of the expenses of

the household and supported Louise Lewis and her mother. The mother died in 1933 and Louise Lewis continued to live in the home of Mrs. Wright occupying the status of an only daughter until about a year before Mrs. Wright's death when the household was broken up and Mrs. Wright spent the remaining days in Memphis, Tennessee, in the hospital or in a nursing home. Miss Louise Lewis married a few years before the death of Mrs. Wright but her marriage does not seem to have interrupted her close association with and attention to Mrs. Wright in her last days.

The record shows that Mrs. Wright was a very astute business woman and one who paid very close attention to her ever expanding farm and financial interests. She rented her land to many different tenants; she financed them in the cultivation and gathering of said crops; she personally attended to the building and repairing of farm houses, barns, fences, etc. The record shows that she owned stock in one of the Tiptonville banks; had some interests in ginning operations; she loaned money to various people in addition to her tenants around Tiptonville with mostly real estate as security. The record also shows that Mrs. Wright was accustomed to lending approximately $50,000 each fall to one of the gins to buy soybeans, cotton, cotton seed, etc., from its customers which loans were usually repaid the following spring.

Through the years Miss Louise Lewis, as a member of her aunt's household, became accustomed to driving Mrs. Wright out to look over the farms, observe the cultivation and harvesting of the crops and attend to the many other duties incident to the operation of such vast farming enterprises. In this way Miss Lewis became

thoroughly conversant with every phase of Mrs. Wright's financial operations.

Certainly from 1930 onward, and possibly earlier, the appellant, Major General Clifton Cates, was away from Tiptonville in service in the Marines and the appellant, Mrs. Prothro, was away from Tiptonville living at various parts of the United States and in recent years in Memphis, Tennessee. The relations between Mrs. Wright and General Cates and his family and Mrs. Prothro and her family were most pleasant and cordial and they kept in communication with her by letter and visited with Mrs. Wright or she visited with them several times each year.

As early as 1941 when Mrs. Wright was 81 years of age and in good health and in full and complete charge of all of her financial affairs, Mrs. Wright told her friend, Mr. Ivy, that she was extremely fond of Louise and that she wanted to do more for her than for anyone else. Mr. Ivy is an auditor who had been coming to Tiptonville each year since about 1931 and preparing Mrs. Wright's annual Federal and State Income Tax returns. Mrs. Wright often talked with Mr. Ivy even before 1941 as to the best method for her to follow in taking care of Louise.

Mr. Ivy recommended the purchase of an annuity and at the request of Mrs. Wright brought a representative of an insurance company from Memphis out to see Mrs. Wright and they reached a tentative agreement whereby Mrs. Wright was going to purchase an annuity for Louise Lewis to have an income of $350 per month for life at a net cost of $50,000 to Mrs. Wright. Mrs. Wright agreed to purchase the annuity and then decided to wait and consult with her then attorney, Hon. Wardlaw Steele, of

Ripley, Tennessee, who advised her not to purchase the annuity and it was never purchased.

In 1944 Mrs. Wright was then 84 years of age and her health began to fail and she began to lean more and more upon Miss Louise Lewis for assistance. Miss Louise Lewis began to keep the books and records and by 1947 she began signing checks for Mrs. Wright.

Sometime in 1946 or 1947 some relatives of Mrs. Wright's deceased husband, Dr. Wright, came to Tiptonville and began asking questions about Mrs. Wright's health, how long she would probably live, the amount of her property, etc. and left the general impression that the Wright heirs were going to file suit for a portion of the property.

This fact was made known to Mrs. Wright by her physician, Dr. Griffin, and some of the witnesses say that Dr. Griffin encouraged Mrs. Wright to go ahead and do something for Louise while Mrs. Wright was still competent and knew what she was doing, leaving the definite impression with Mrs. Wright that after her death the heirs of Mr. Wright were going to bring a lawsuit and make trouble. This was a prediction that certainly came true because after the death of Mrs. Wright the heirs of Dr. Wright brought a suit in the Chancery Court of Lake County seeking to establish title to a large portion of the lands owned by Mrs. Wright during her lifetime which litigation ultimately reached the Supreme Court of Tennessee and has been recently decided adversely to the heirs of Dr. Wright.

At any rate, Mr. Allison, who was cashier of the First State Bank of Tiptonville and a close friend of Mrs. Wright, testified that in 1947 Mrs. Wright had deposits

in his bank of over $100,000, she had government bonds totaling over $125,000 and deposits in other banks which made her assets over $250,000. Mr. Allison was informed by Mrs. Wright of the recent visit of some of the Wright heirs and she manifested an intention to Mr. Allison to get rid of some of her property before she died to be sure that if the Wright heirs were successful they would not get all of her property. On this occasion in 1947 Mrs. Wright made gifts of government bonds totaling some $15,000 to Louise Lewis, $10,000 to General Cates, $8,000 to children of General Cates, $5,000 to Mrs. Prothro and $2,000 to Mrs. Prothro's son.

She also authorized the transfer to Louise Lewis of an additional $62,000 in what she called government bonds but which were actually short-term certificates of indebtedness issued by the Federal Reserve Bank. The certificates were surrendered to Mr. Allison on this occasion. However, Mr. Allison suggested that they wait until the following year when the certificates matured for the actual transfer since neither Miss Lewis nor Mrs. Wright needed the money. His suggestion was agreed upon and the following year in 1948 when the certificates were cashed, the money was placed to the account of Mrs. Wright who then signed a check for $62,000 payable to Louise Lewis. This check was made out by Mr. Allison and signed personally by Mrs. Wright and the check cashed or deposited to the account of Miss Louise Lewis.

Mr. Allison's testimony clearly negates any influence by Miss Lewis upon her aunt but shows clearly that the entire transaction was of Mrs. Wright's own doing and Mr. Allison relates no incidents or circumstances which would indicate that Mrs. Wright gave these large gifts

for any reason except her great love for her niece and foster daughter and possibly a desire to complete the gift before her death so as to thwart any opportunity for the Wright heirs to take this property away from Louise or the other donees.

It further appears that Mr. Allison, the banker, was informed by Mrs. Wright about the gift in 1948 of $10,000 to Miss Lewis as a part payment on a cotton gin and of $3,500 to buy a house and lot in Monteagle, Tennessee, where Mrs. Wright was accustomed to spending several weeks each summer. Mr. Allison also testified that nearly every time he talked to Mrs. Wright she seemed to be disturbed about the fact that the Wright heirs were going to cause trouble by litigation after her death. In June, 1951, Mr. Allison was informed that Mrs. Wright was about to sell $20,000 worth of timber from a tract of land known as the ''Wrights Switch Land'' and that she intended to give the $20,000 to Miss Lewis.

Mr. Allison stated in substance that he became apprehensive over the bank's position in possible litigation by the Wright heirs after Mrs. Katie Wright's death since so much money had gone into and out of the account of Mrs. Wright during the past several years a considerable portion of which upon checks signed by Miss Louise Lewis. With the additional $20,000 gift about to be made he discussed the matter with the bank's president, Mr. Donaldson, an attorney, and as a result of that conference Mr. Donaldson prepared a short paper writing in which Mrs. Wright ratified all checks which may have been written by Miss Lewis on her account.

Said ratification is in the words and figures as follows:

''This paper is to evidence and show that I have given

to my niece, Louise Lewis Nicholas, the interest in the Choctaw Gin she purchased and authorized her to pay for same out of my funds, also the purchase price of two houses and lots in the town of Tiptonville. I have also given her the authority to draw a check or checks on me for the amount of the proceeds of the sale of the timber on the wrights switch or wrights woods tract which recently sold for $20,000. And I hereby ratify and confirm any and all checks that she has drawn on my account at the bank.

"This paper is being written at this date because of the timber transaction aforesaid.

"June 9, 1951

"/s/ Mrs. Katie L. Wright<br>
Mrs. Katie L. Wright

"Witnesses:

/s/ W. M. Allison

/s/ Mrs. Martha King

/s/ Mrs. Elmina Johnson"

It is to be noted that this ratification was made the same day that the timber was sold and the gift to Miss Lewis completed by check. Mr. Allison is very firm in his testimony that Miss Lewis did not even know about him preparing the ratification paper and that he explained it very clearly to Mrs. Wright and she understood and signed the ratification.

Mr. Allison positively indicates by his testimony that Mrs. Wright's actions were all of her own volition and free from any influence on the part of Miss Lewis.

While this gift of the Wrights Switch Timber for $20,000 on June 9, 1951, was the last gift in point of time which is under attack, yet it appears that on August 17,

1951, Mrs. Katie Wright was still in charge of and directing her business affairs.

For some thirty-nine years one of her tenants, Mr. Harris Campbell, a witness for Miss Lewis, had been farming a certain tract of land belonging to Mrs. Wright. Mr. Campbell had obviously been a very successful tenant and a satisfactory tenant for the thirty-nine year period and seemingly Mrs. Wright was very fond of him. He testified that back about 1936 she was very insistent that he run for magistrate, she directed his campaign, put up all the finances and he was elected for which she seemed to be very jubilant. As Mr. Campbell said in his testimony everything Miss Katie did always came out all right.

Mr. Campbell testified that from 1948 through 1951 he made repeated efforts to buy the farm and Mrs. Wright had on more than one occasion refused to sell it to him saying on at least one occasion that the farm belonged to Louise. Finally in 1951 Mrs. Wright agreed to sell it to him saying that she thought that he would take better care of the place than anyone else and that she thought he was entitled to it so she agreed to sell it to him at a price of $275 per acre. The deal was closed on August 17, 1951, at Mrs. Wright's home. Mr. Campbell, the banker, Mr. Allison, Hon. John Drane, attorney for Mrs. Wright, Dr. Rainey, a Notary Public and at least one nurse were present. Mrs. Wright personally signed the deed and all of these people who were present testified that at that time Mrs. Wright was mentally competent and fully understood the nature of the business she was transacting.

It is significant to note that General Drane testified

that he thought from the way Mrs. Wright referred to her affection for Mr. Campbell and the thirty-nine years of service which he had rendered her that she was going to give him the farm but instead she charged him $275 per acre and had the deed to recite that the land was being sold by the acre and the number of acres was to be determined by a subsequent measurement by a competent surveyor to be agreed upon by the parties. Gen. Drane also testified that he was summoned to Mrs. Wright's home before the deed to Mr. Campbell was drafted and ''she told me what she wanted to sell and why she wanted to transfer it and why she wanted to sell it to this particular person; she gave her reasons for all of it.''

Mr. Ivy, the auditor and close friend of Mrs. Wright for over twenty years, testified very emphatically that Mrs. Wright, up through 1947, was a person of strong mind and strong will and of sufficient mental capacity not to be influenced by anyone and that he never at any time saw any evidence of Mrs. Wright being influenced by anyone. On the contrary, he testified that on many occasions Mrs. Wright expressed to him an intention to take care of Louise in such a manner that she would never be dependent upon anyone. He also testified that Mrs. Wright was very, very proud of and fond of General Cates and that she had told him that she intended to provide for General Cates by leaving him a considerable quantity of land and it is significant to note that Mrs. Wright did leave General Cates considerably more land under her will than she did any of the other beneficiaries.

All of the gifts mentioned above and many other gifts by Mrs. Wright to other parties which are not in controversy were all duly reported along with her annual income tax report. Mr. Ivy prepared all of these reports

on information sometimes received from Mrs. Wright and sometimes received from Miss Lewis.

Mrs. Wright gave General Cates and members of his immediate family approximately $25,000 in cash or bonds during the period from 1943 to her death in 1953.

The appellants charge that Miss Lewis was guilty of actual fraud in procuring the deeds to the Negro houses in her own name to wit, the Jim Taylor property which cost $5,000 and the Hicks property which cost $2,500. We do not find that the evidence indicates any fraud. Jim Taylor is a colored woman who had cooked for over forty years for Mrs. Wright. Mrs. Wright expressed an intention to provide a home for her for the remainder of her days. Likewise, the Negro, Hicks, was very good to Mrs. Wright in her last years of illness and she had to depend on him to lift her in and out of the wheel chair, in and out of the car and for work around the home. She wanted him to have a home for the remainder of his life. The record indicates that these two Negroes are not versed in financial affairs.

It seems entirely reasonably to us that Mrs. Wright, being the careful and capable business woman that she was, foresaw that if she gave deeds to these pieces of property to either of these Negroes that in a short time they might either sell, mortgage or dissipate the property and be without a home the rest of their days. Such a result would have been the very opposite of what Mrs. Wright intended to do.

It appears to us that she adopted a very reasonable and expedient method of making sure that these two people had a home. She had the property deeded to Louise and gave the Negroes only a life estate. Obvious-

ly, she trusted Louise to carry out her wishes and to look after these two people to the extent of seeing that they had a home. By letting Louise have the remainder interest in the property, she had an additional incentive to oversee the property and see that the improvements were kept in repair and thus more effectively carry out Mrs. Wright's wishes with reference to these two Negro servants.

Another example of the way Mrs. Wright's wishes are being carried out is the disposition of the $1,000 gift made on June 1, 1951, to Jim Taylor. This money was deposited to the credit of Jim Taylor in the bank and the banker has never told Jim Taylor that she had this money on deposit. When Jim needs money she goes to Mr. Allison at the bank and "borrows" some money. Mr. Allison, the banker, withdraws the amount she "borrows." If she repays it, the money is redeposited to her account. As Mr. Allison says if she knew the money was there she would soon draw it all out and it would be gone pretty quickly. Therefore, we see no fraud or improper action of Miss Lewis in taking the deed to said property in her name and are of the opinion that this practice was entirely in accord with Mrs. Wright's wishes.

In July, 1947, Mrs. Wright had her then attorney, Hon. John Drane of Newbern, Tennessee, prepare a new will for her. This will is somewhat lengthy and it would unduly prolong this opinion to copy the same. The personal property including a $25,000 life insurance policy after the payment of all federal and state inheritance taxes, costs of administration, etc., is divided equally between General Cates, Mrs. Prothro, Louise Lewis and Louise's sister, Mamie Rotrammel. The will included specific gifts

totaling $38,000 to persons other than General Cates, Mrs. Prothro and Louise Lewis.

General Cates was given 299 acres of land for life with remainder in fee to his two children. Louise Lewis was granted the fee to 156 acres of land and on this devise the testatrix said as follows:

"I give, will and devise to my niece, Louise Lewis, who has lived with me for many years, and for whom I entertain great love and affection, in fee, my tract of land containing 156 acres more or less situated in District No. 2, etc."

Mrs. Wright's residence in Tiptonville was left for life to Louise Lewis and her sister, Mamie Rotrammel, and upon the death of the survivor the fee in trust for charitable purposes as a memorial to Dr. J. M. Wright and Mrs. Katie Wright. All of the remaining real estate not disposed of under the will was left in trust for General Cates, Louise Lewis, Katherine Prothro and Mamie Rotrammel.

The annual rentals from the farm lands were about $36,000 per year and at the time Mrs. Wright made this will she had over $250,000 in cash and bonds on hand and so far as the record shows owed no indebtedness.

The original will was executed on July 11, 1947. Mrs. Wright executed a codicil to her will dated September 12, 1947, in which she provided for the education of Carolyn Wright Algee. Mrs. Wright stated in the codicil that it was made necessary by the death of J. P. Algee, father of Carolyn. Mr. Algee had been Mrs. Wright's close friend and banker who was succeeded by Mr. Allison.

On November 7, 1947, Mrs. Wright made a gift of

$5,000 to General Cates. On November 12, 1947, Mrs. Wright made a second codicil to her will in which she made Louise Lewis and General Clifton Cates co-trustees with the original trustee, Harry Smith, for the management of the residual real estate mentioned in the original will. Mrs. Wright made no mention in this codicil of the $5,000 gift to General Cates just five days before.

On December 5, 1947, less than one month after the second codicil to her will Mrs. Wright made the large gift of government bonds through Mr. Allison of $15,000 to Louise Lewis, $10,000 to General Cates, $5,000 to Mrs. Prothro as well as $10,000 additional to the children of General Cates and Mrs. Prothro. At this time she also made arrangements for the transfer of an additional $62,000 to Louise Lewis but this was not completed until the certificates of indebtedness matured sometime in the year 1948. Mrs. Wright never made any additional codicils to her will after November 12, 1947. This indicates a plan on the part of Mrs. Wright to dispose of part of her property by will and a part of it by direct gifts in her lifetime.

The nurses and doctors who attended Mrs. Wright during her last years all sustained the insistence of Mrs. Louise Nicholas that she neither exercised influence nor attempted to exercise influence over Mrs. Wright for the purpose of obtaining gifts. They all testified that Mrs. Wright was of sound mind and of strong will during the period from 1947 through 1951 and of a nature and disposition to have successfully resisted any attempt to exercise control over her. Mrs. Nicholas was prevented by the Dead Man's Statute (T. C. A. sec. 24-105) from testifying as to transactions between her and Mrs. Wright concerning these gifts.

■ Therefore, from a review of the entire evidence in this record we are of the opinion that the evidence fully rebuts the presumption of undue influence on the part of Mrs. Nicholas arising out of the confidential relationship. We think the proof clearly shows that Mrs. Wright, during the period in which the gifts were made, from 1947 through June 9, 1951, was a person of strong will and alert mentally and not under the dominion or control of Miss Lewis or anyone else. It appears that the gifts were made by Mrs. Wright as a result of the love and affection which she bore to this young lady whom she had partially reared since she was seven years of age and who had occupied the place of her own daughter and we think the gifts were also made as a manifestation of appreciation which Mrs. Wright felt toward this young lady who had spent the best years of her life living with and administering to her aged aunt, Mrs. Wright.

■ Likewise, we are of the opinion that the evidence submitted on behalf of Mrs. Nicholas meets the test set out by Judge Prewitt in the case of Turner v. Leathers, 191 Tenn. 292, 232 S. W. (2d) 269, 271, to-wit:

"* * * Where he is under the unquestioned 'dominion and control' of the donee it is necessary that he have competent, independent advice, free from the influence of the donee, in order for the gift to stand."

■ We hold that during this period of time Mrs. Wright had the benefit of competent independent advice, free from the influence of Miss Lewis or any of the donees, and particularly in the person of her banker, Mr. Allison, and her tax accountant, Mr. Ivy. Both of these persons were friends of long-standing in whom

she had great confidence and who, collectively, were familiar with all of the gifts as they were being made through the years and they had every opportunity to know whether or not she was being overreached and to have assisted her if they had thought she was being over-reached or subjected to improper influence. Likewise, and to a lesser extent, it appears that Mrs. Wright, up through August, 1951, was accustomed to advise with her attorney, Mr. Drane of Newbern, Tennessee, and Mr. Joe Riddle, now deceased, attorney of Tiptonville, Tennessee.

We have not discussed each of the gifts separately and the quantum of proof on some of the smaller gifts is not so strong as that on the large gifts of $62,000 and $20,000, but since the smaller gifts fit into the same pattern as the larger gifts which we have sustained we do not think it necessary to discuss each of them in detail.

The above portion of this Opinion was prepared before Judge Avery prepared his dissent to that portion which holds legal the gifts made to Miss Louise during the year 1951, totaling $31,000.

We respectfully differ with our colleague with reference to the force and effect of the testimony of Mr. Allison, the banker, concerning these gifts. We do not think his testimony was impeached in any manner. He testified without contradiction that in November, 1947, after the death of Mr. J. T. (Ted) Algee, cashier of The First State Bank & Trust Company, of Tiptonville, he had been offered the position to succeed Mr. Algee. He further testified that it was Mrs. Wright, who was one of the leading business figures of Lake County and a large depositor in the Bank, who sent for him and en-

couraged him to take the position, saying that since the death of Mr. Algee she did not feel that she had anyone in the Bank to look after her interests. We think the record clearly shows that Mrs. Wright did continue to rely strongly upon the advice of Mr. Allison in business affairs.

We also respectfully differ with Judge Avery in his Opinion that it was passing strange that Mr. Allison, the banker, and Mr. Donaldson, the President of the Bank, obtained a ratification in writing from Mrs. Wright under date of June 9, 1951. In our opinion, such conduct seemed both reasonable and proper; Mrs. Wright was then 91 years of age; many thousands of dollars had passed through her bank account on checks drawn by Miss Louise; the last written authority signed by Mrs. Wright authorizing Miss Louise to sign checks was an unwitnessed letter of date November 20, 1947; Mrs. Wright's health had continued to deteriorate since 1947; neither Mr. Allison nor Mr. Donaldson knew the contents of Mrs. Wright's will; Mrs. Wright herself had told Mr. Allison that she expected the heirs of Dr. Wright to bring a suit against her estate after her death; Mrs. Wright had no children, and we think that the Bank officials had good reason to believe there would be litigation over Mrs. Wright's estate after her death among her own heirs and next of kin.

Therefore, we think there was every reason for the officials of the Bank to be apprehensive lest the Bank be drawn into such litigation, and we think they acted both naturally and properly in the interest of the Bank when they took the ratification of date June 9, 1951. The Bank might well have been involved in this present litigation with a potential liability of many thousands of dollars,

if these officials had not taken the precaution of obtaining the ratification of date June 9, 1951, signed by Mrs. Wright.

Further, we respectfully differ with our colleague in his Opinion that in 1951 apparently Mrs. Wright's control over her business affairs had been abandoned. The testimony of Mr. Allison, Mr. Campbell who purchased the land, and Attorney John M. Drane, all indicates the contrary. They talked to and discussed business matters directly with Mrs. Wright herself and not through the medium of Miss Louise.

On the question of competent independent advice, in the recent case of Miller v. Hubbs, Tenn. Sup., 285 S. W. (2d) 527, our Tennessee Supreme Court has held that advice or suggestion of a husband to his wife that his brother who had been kind to both of them, should have their property after their respective deaths, was sufficient to meet the test laid down in Turner v. Leathers, supra, where the widow had made a joint deposit of funds in a Federal Savings & Loan Association in the name of herself and the brother of the deceased husband, with a right of survivorship in the brother. In other words, the Supreme Court has established the rule that the competent independent advice does not have to be contemporaneous with or immediately preceding the gifts, in order to overcome a presumption of invalidity because of confidential relationship between the donor and donee.

While it is true that Mr. Ivy the auditor, testified that he did not believe he had talked to Mrs. Wright personally after 1947, yet he had advised her on many occasions to give Miss Louise bonds or money, and to give it to her in her lifetime so that she could be sure that Louise had

gotten it. He further testified that the conduct of Mrs. Wright in making the serious gifts to Miss Louise and others, fitted into the general picture of what he thought Mrs. Wright intended to do but that he did not believe she had given Louise as much money as she intended to give her.

As stated above, we think the advice which Mrs. Wright received from Mr. Allison, her banker, General Drane, her attorney, Mr. Joe Riddle, her attorney, and Mr. Ivy, her tax accountant, was sufficient to meet any test of competent independent advice which might be required under Turner v. Leathers, supra.

Therefore, the Assignments of Error are respectfully overruled and the Decree of the Chancellor affirmed. The cause will be remanded to the Chancery Court for further proceedings consistent with this Opinion. Appellants will pay the costs of this appeal.

Avery, P.J., (Western Section), dissents in part.
Bejach, J., concurs.

Avery, Presiding Judge (Western Section) (dissenting in part).

I concur in the majority Opinion of this Court with much that is said therein. . Some of the statements made in the Opinion, which seem to be necessary that I set out in this partial dissenting Opinion, based upon the reasons assigned in the Opinion and the facts as shown by the proof, and the legal rules laid down in such cases for our guidance, seem to me to substantiate the position I am taking. Particularly, do I agree with the statement, 301 S. W. (2d) 542, of the majority Opinion that:

"We agree with the insistence of appellants that

there was a confidential relationship existing between Mrs. Nicholas and Mrs. Wright. For several years prior to Mrs. Wright's death Mrs. Nicholas handled a large portion of Mrs. Wright's business including the receiving and disbursing of money, collection of farm rents and management of the farm property. Bayliss v. Williams, 46 Tenn. 440; Miller v. Proctor, 24 Tenn. App. 439, 145 S. W. (2d) 807.

\*    \*    \*    \*    \*    \*

"Since we have found that the gifts were received by Mrs. Nicholas during the period when she occupied a confidential or trust relationship toward Mrs. Wright, a court of equity must review such transactions with the strictest scrutiny."

It would serve no good purpose for me to set out, in this partial dissenting Opinion, a summary of all the evidence, oral, documentary and circumstantial, found in this record. I reluctantly agree with my distinguished colleagues that as to some of the gifts in question made to Mrs. Nicholas there were some conversations between Mrs. Wright, Mr. Allison, a banker in Tiptonville and Mr. Ivy, the person who had prepared her income tax and gift tax returns for a long number of years upon the advice, counsel, information and calculations of Mrs. Wright with respect to her income and disbursements, wherein there may have been some impartial and independent advice sufficient to meet the legal requirement therefor as to some of the gifts in controversy, but Mr. Ivy did not have conversations with Mrs. Wright about her business or her income and gift taxes for the years 1948, 1949, 1950, 1951 and 1952. This income tax expert or accountant admits that Mrs. Wright did not keep her books for the last several years of her life, particularly,

those set out above.  Her ledger of receipts and disbursements back into the 30's has been filed, and an examination of this book corroborates the testimony of Mr. Ivy in this regard.  For reasons herein stated, I concur only as to the gifts made prior to 1951.

It must be remembered that Mrs. Wright was nearly 93 years old when she died in the early part of 1953.  The doctors testify that due to her age, she had continued to deteriorate both physically and mentally from the time she was 81 until the date of her death.  The record is fairly clear that from May 1948 until the date of her death, she was a physical and mental invalid.  She suffered a cerebral thrombosis in August, 1949, which resulted in paralysis of her left leg, and by September of 1950 she was suffering generally over the entire body from the effect of that cerebral disease, commonly referred to as a stroke, plus arteriosclerosis, and in addition thereto, her age and general weakened condition had brought about some disease of the bladder.  During that whole term of years, she was apparently unable to walk and she had to be lifted in and out of bed.  She had nurses in constant attendance who administered heat packs and strong drugs to alleviate her pain; her eyesight was impaired, and for the years 1948, 1949, 1950, 1951 and 1952, and that part of 1953 in which she lived, her business was conducted by Miss Louise.  Her physical condition is shown by the testimony of Drs. W. C. Colbert, Thurman Crawford, and W. T. Rainey, and the way she had to be cared for is shown by the depositions or testimony of Elmina Johnson, Rhetha Jim King, Clifton Cates, Emma Riddick, Jim Taylor, and others. Her strength of body and mind continued to deteriorate until she was declared incompetent in January, 1953.  During the early portion

of her illness, that is, in 1947 and 1948, Mrs. Nicholas obtained from Mrs. Wright, beginning with October 20, 1947, and ending September 21, 1948, a period of exactly 11 months and 1 day, $79,150 in cash and $15,000 in U. S. Government Bonds, Series "C", making a total of $94,-150 in cash and bonds, the largest gift being $62,000 in February of 1948, which had been in contemplation since some time in the Fall of 1947.

Now, let us take a look at what occurred between September 21, 1948, the date of the last gift in that year, amounting to $10,000, to the date of the gifts in 1951.

In the first place, there is absolutely nothing whatever in the record with respect to the gift of $6,000, evidenced by check dated March 17, 1951, signed "Mrs. Katie Wright, By Mrs. Louise L. Nicholas", and made payable to Louise Lewis Nicholas, indicating that Mrs. Wright had any advice whatever. The same is true of the $5,000 check, dated May 25, 1951, signed "Mrs. Katie Wright, By Louise L. Nicholas", and payable to Louise L. Nicholas. And I am unable to find anything in the entire record that amounts to impartial and confidential advice by any person to Mrs. Wright, relative to the $20,000 gift in 1951. From the date of the last gift in 1948 to the date of the first gift in 1951, it was approximately 2 years and 6 months, during which period of time the record is abundant that Mrs. Wright grew continuously worse, physically and mentally. From the date of the last gift in 1948 to the date of the last gift in 1951, a period of 2 years and 9 months, the last gift being $20,000, according to the testimony of Mr. Ivy, Mr. Allison, and all of the attendants in the home of Mrs. Wright, Miss Louise was in complete charge of all the business affairs of Mrs. Wright, and with Mrs. Wright unable to walk, unable to

see, suffering from partial paralysis and irritating bladder conditon, arteriosclerosis or high blood pressure, in and out of the hospital time after time, with an income of $36,000 a year. At the time these gifts began in 1947, when Mrs. Wright had $106,000 in one bank, together with approximately $150,000 in Government Bonds, and collecting $36,000 a year in rents, handled by Miss Louise from 1948 to 1953, inclusive, Mr. Allison, the banker, reluctantly admits that Mrs. Wright had practically no cash assets.

Miss Louise continued to administer the estate of Mrs. Wright, as Guardian, until the death of Mrs. Wright, and in October of 1953, after having collected the $36,000 annual rents, she turned over to the Executor the sum of only $14,339.31.

The most that can be said with respect to any advice that Mrs. Wright may have had in connection with the gifts made in 1951, totaling $31,000, is to be found in the testimony of Mr. Allison and one Mrs. King, and if I am able to properly understand this testimony, the only thing that can be said about it, is that it constitutes an effort to show that Mrs. Wright had some knowledge of what she was doing, and that only as to the $20,000 gift. This $20,000 gift was realized from the sale of a tract of timber known as the "Wright Switch Tract". Mrs. King said this:

"At the time she sold it, she just said she wanted Louise to have it, she was going to give it to her, the money that she got from it, that she wanted the ones to have the money that had been good to her; she said that so many times." (R. 488)

The witness further said that she had heard Mrs. Wright

say this before. This witness also testified that Mr. Riddle handled the sale. Now, let us see what Mr. Allison said about this sale. His general statement is to the effect that Louise came to the Bank one day and told him that this timber sale was going to be made and that she was going to get the money. He presumed that after the sale was made, Louise would write a check on Mrs. Wright's account to herself. At that time he had written authority on file in his Bank, dated November 20, 1947, Exhibit ''E'' to Allison evidence, in the following words and figures:

''Mr. W. M. Allison, Cashier
  First State Bank & Trust Co.
  Tiptonville, Tennessee.
''Dear Murray,

''This will be your authority to honor checks drawn against my account in The First State Bank & Trust Co., Signed Mrs. Katie Wright by Louise Lewis.

''Nov. 20, 1947                    (Mrs. Katie Wright)''

When he got this information from Miss Louise that she was going to get this $20,000, he immediately conferred with Mr. Donaldson, President and Attorney of the First State Bank & Trust Company, Tiptonville, Tennessee, and at that time there was prepared Exhibit 1 to the testimony of Mr. Allison in the following words and figures:

''This paper is to evidence and show that I have given to my niece, Louise Lewis Nicholas, the interest in the Choctaw Gin she purchased and authorized her to pay for same out of my funds, also the purchase price of two houses and lots in the town of Tiptonville. I have also given her the authority to draw a check or checks on me for the amount of the proceeds of the sale of the timber

on wrights switch or wright woods tract which recently sold for $20,000. And I hereby ratify and confirm any and all checks that she has drawn on my account at the bank.

"This paper is being written at this date because of the timber transaction aforesaid.

"June 9, 1951                   s/s Mrs. Katie L. Wright
                                   Mrs. Katie L. Wright

"Witness:
    W. M. Allison
    Mrs. Martha King
    Mrs. Elmina Johnson."

An inspection of this document shows it written in the body on the typewriter; that at the time it was prepared a line was written for Mrs. Wright to sign, beneath which her name was written in type, and that the date of this instrument is in longhand ink, and that it was prepared to be witnessed by three witnesses. These witnesses appear to be W. M. Allison, Mrs. Martha King, and Mrs. Elmina Johnson. It was written in Mr. Donelson's office and carried to Mrs. Wright's home for execution by Mr. Allison. He had no conversation with Mrs. Wright between the time Louise told him she was to get the money and the time this document was presented to Mrs. Wright at her home. When you see that Mrs. King and Mrs. Johnson are witnesses to this instrument, it is easy to understand why Mrs. King and Mrs. Johnson, sisters, testified that the day Mrs. Wright sold this land they heard her say that "she was going to give Louise the money". It is passing strange, however, that the banker and his attorney thought it necessary for Mrs. Wright to execute another written authority by which she ratified

the many thousands of dollars of checks to which her name had been signed by Mrs. Nicholas, and to give Mrs. Nicholas authority to sign further checks and, more particularly, to confirm the authority for Mrs. Nicholas to sign this $20,000 check. However, in view of the age of Mrs. Wright, her then physical and mental condition, and the knowledge on the part of Mr. Allison that Mrs. Nicholas had had complete control of the property of Mrs. Wright for several years, there is but little weight to be given to the surmise that to have such a paper, the Bank might be further protected against some imaginary claim of the relatives of Mrs. Wright's husband. Some quotations from Allison's testimony might be enlightening:

"Q. Now, tell His Honor how that came about that you asked that that paper be prepared. A. Well, Louise—I already had more or less of an informal authority from Mrs. Wright authorizing Louise to sign checks, and it is general banking procedure that when you are going to permit another person to sign checks with your name, that you have some authority in your files for that. So when this came up, I didn't know whether Mrs. Wright was going to write the $20,000 check or whether Louise was or who; so I asked Mr. Donelson. I told him the circumstances and this paper was prepared and I carried it up there and got it signed." (R. 535)

He stated that Mrs. Wright's mind was O.K. at that time and that "there was not anything happened that would lead me to believe otherwise". (R. 536) Allison also testified that Mrs. Wright signed that $20,000 check and that when asked if he was present, said:

"No, Louise told me that she was going to get this $20,000 and that is what prompted me to get this instrument drawn and carry it up and have it signed.

"Q. It was after Louise told you she was going to get this $20,000 that you talked to Mr. Donelson and you and Mr. Donelson decided you would like to have Mrs. Wright's ratification of these big checks? A. Correct.

"Q. And that is the reason that Ex. No. 1 was prepared and executed? A. Right." (R. 538)

And again, he said:

"Louise came to the bank either the day before or this particular morning and said that Mrs. Wright was going to give her the proceeds of the sale of this Wright switch timber, and with the thought in mind that possibly Louise was going to sign the check payable to herself, and then to protect the interest of the bank, although we had an informal authority for Louise to sign checks for Mrs. Wright, I just thought it would be better maybe to have one witnessed, thinking that Louise was going to sign this check herself, and that was the reason why this other paper was drawn." (R. 546)

He further stated that he thought the $20,000 check was in his handwriting except the signature, but on looking at it said it wasn't. Further questioned about it, and about what he had said to Mrs. Wright and what she had said to him on that occasion, he said:

"Well, I told her that Louise had told me she wanted to give her the thing, just a general discussion about the paper was all, and she said, 'Well, read

it to me', and I read it to her, and she said: 'I will sign it', and that is all; she said, 'I will sign it, that is what I want to do'.'' (R. 547)

He was then asked if he could think of any reason why Mrs. Wright signed that check herself, and he stated that he had no discussion with her about her signing the check that he could recall, but "she had told me prior to that time that she was going to give the Wright switch tract to Louise". He could not fix the time when she told him that. (R. 548)

In the case of Black v. Pettigrew, 38 Tenn. App. 1, 270 S. W. (2d) 196, 202, in an Opinion by the now Associate Justice Swepston of the Supreme Court and at the time a member of this Section of the Court of Appeals of Tennessee, which is a case wherein there existed a confidential relationship between Homer Black and his Aunt, Mrs. G. A. Black, as well as the mental condition of Mrs. Black was involved, and which Opinion was approved by the Supreme Court of this State in its denial of certiorari, it is said:

(a) "The relationship of principal and agent is one of trust and confidence. McNeill v. Dobson-Bainbridge Realty Co., 184 Tenn. 99, 106, 195 S. W. (2d) 626."

(b) "We therefore agree with the ultimate finding of the Chancellor that a relationship of trust and confidence existed between Homer and Mrs. Black. Judge Felts has ably stated the governing rules in equity in such a situation and same need not be here repeated. Roberts v. Chase, 25 Tenn. App. 636, 650 et seq., 166 S. W. (2d) 641; Miller v. Proctor, 24 Tenn. App. 439, 145 S. W. (2d) 807."

In that case it was assigned as error that the Court should have held that Mrs. Black was not competent to transact business. The Chancellor had held that she was competent to transact business, and as to that assignment, the Opinion proceeds:

(c) "We think the decided weight of the evidence sustains the above findings. We have no doubt that she was of sound mind and capable of attending to her business."

Much stress has been placed upon the fact that Mrs. Wright, as late as August, 1951, executed a deed to a tract of land to one Harris Campbell, and that she was mentally capable to execute that deed which took place after the last gifts to Mrs. Nicholas in June of the same year. I can see no comfort that we can get from the fact that Mrs. Wright was competent to execute that deed to support the holding in the majority opinion. General Drane wrote that deed. He expressly stated that he thought from what Mrs. Wright said that she was going to give that tract of land to the grantee who had been a tenant on her farm for a long number of years; but when she went to execute that deed she did just the reverse and charged Mr. Campbell $275 an acre for that tract of land. Just what happened to that money, the record does not reveal. I am likewise unable to see any philanthropic, sympathetic or protective ideas involved in the action of Mrs. Nicholas with respect to the gifts Mrs. Wright intended to make to the servants who had waited on her so long. Neither do I see any constructive action on the part of the banker to withhold from one of these servants the fact that Mrs. Wright had given her $1,000. If Mrs. Wright was free to act, as the majority Opinion finds her to be, and if she was as strongminded

as the witnesses, at some points in their testimony, would want the Court to believe, it is passing strange how Mrs. Nicholas turned up with the deed to this real estate that Mrs. Wright wanted one of the servants to have, made to her in fee simple absolute, and thereafter conveyed a part of it to the servant only for life, with remainder interest in the property to herself. I fully agree with counsel for appellant that the Jim Taylor transaction is one hard to understand, in order to give sincerity to the action of Mrs. Nicholas. $5,000 of the money paid for certain real estate to Clyde and Nezzie B. Sowell on September 27, 1948, was reported as a gift to ''Mrs. Jim Taylor, Tiptonville, Tennessee,'' the female Negro servant (Exhibit 7, Ivy deposition). A copy of this check appears in the record as Exhibit 18 to Ivy's deposition. This servant was told by Mrs. Wright that she was buying her a home and giving it to her. The facts were that the property was conveyed to Mrs. Nicholas (Exh. 2, Jim Taylor's testimony—deed from Sowell et ux, to Louise Nicholas). The development from that transaction is that there is another house located on this real estate occupied by the brother of Mrs. Nicholas (R. 640, 641) and only a portion of that real estate was ever conveyed to Jim Taylor by Mrs. Nicholas and in that transaction, Mrs. Nicholas reserved the life estate. (Exh. 1, Jim Taylor's testimony) There were two separate lots in this deed, both within the corporate limits of Tiptonville, Tennessee. One lot was 60' x 271', fronting on Wynne Street. The other lot was 60' x 135½'. The deed recites that the lot 60 x 271 had a residence on it constituting the homeplace of the grantors. This deed is dated the 23rd day of September, 1948, and filed for record in the Register's office on the 27th day of Sep-

tember, 1948. In March of 1949 (Exh. 1 to deposition of Jim Taylor) shown to be a deed signed by Louise Lewis and Mrs. Katie Wright, in the granting clause of which the name of Mrs. Wright nowhere appears as a grantor, this deed recites: "I, Louise Lewis, a single person, do hereby bargain, sell and convey unto Jim Taylor the hereinafter described house and lot for and during her lifetime only, the remainder interest therein is not herein conveyed but is reserved and remains in the grantor." The consideration in that deed is expressed as follows: "For and in consideration of $1.00 cash paid and in consideration of the fact that the grantee herein has been a valuable and trusted servant and employee of Mrs. Katie Wright with whom the grantor herein has lived over a period of years, in Tiptonville, Lake County, Tennessee, and other good and valuable consideration, not herein named". The description of this lot so conveyed to Jim Taylor, the servant, is the same as that of the vacant lot described as the second tract in the deed from Clyde Sowell et ux, to Louise Lewis. If the gift tax statement is true, as shown by the report above referred to, to the effect that the $5,000 was given to Jim Taylor, and which facts were reported to Mr. Ivy by Louise, is it not a little strange that Jim Taylor got no title to any kind of property for life or otherwise until six months after the deed was made by Sowell and wife to Louise Lewis, or March of 1949, and then so far as this record shows, the lot with the homeplace on it remained to be owned by Miss Louise and in which her brother lived. (R. 640)

Almost two years thereafter, and on June 9, 1951, this statement given for the alleged protection of the Bank (Exh. 1 to testimony of Elmina Johnson) among the

many things it proposes to do, recites the fact that Mrs. Wright had given to Louise "also the purchase price of the two houses and lots in the town of Tiptonville". It is true that Elmina Johnson testified that Mrs. Wright wanted Louise to have these homes after the negroes died or quit working, but it is not easy to determine what she meant by her testimony. At R. p. 435, she stated:

"Well, for one thing, she bought a home for each of the negroes, one for Jim and one for Hicks."

And at R. p. 436, in answer to a question about taking care of Louise, this witness said:

"Well, she gave Louise money and bonds and then she wanted Louise to have these homes, the homes were bought for the Negroes and after their death, Louise was to get those homes.

"Q. After their death Louise would get their homes, is that what you tell me? A. Well, after they quit work, I suppose after they were dead, because she wanted Louise to have the homes later, but she did want Louise to take care of the Negroes; she didn't want them to want for anything."

Elmina Johnson and Mrs. Rhetha King, two of the nurses who were with Mrs. Wright, were sisters and to each one of them she made gifts at some time of $2,000. These are two of the strongest witnesses testifying on behalf of Mrs. Nicholas, but when their testimony is examined, direct and cross, it is easily ascertainable that there are many conflicts in same, as it relates to the gifts to Mrs. Nicholas, based upon such remarks as: "Mrs. Wright was a strong-minded person", or "she was a free giver", or "she wanted to help those who had helped her", and expressions of that kind. These two sisters

are witnesses to the document dated June 9, 1951. The last sentence in this document is stronger testimony than any verbal testimony coming from the lips of any witness. The last sentence is: "This paper is being written at this date because of the timber transaction aforesaid."

The cases in which courts of equity have set aside gifts or other transactions on ground of undue influence, fall in two groups: In many of the cases, these two groups overlap, and the facts of the cases show the characteristics of both groups are applicable. However, there is a distinctive principle which separates these two lines of cases, and this principle is so fundamental and important that it should never be overlooked.

I would say that group No. 1 embraces cases where the facts show the exercise of actual undue influence exerted by the donee or someone for him upon the donor for the express purpose. In those cases, the donor or grantor was peculiarly susceptible to such influences because of mental weakness, ignorance, old age, necessitous circumstances and the like. It may be said that these cases, for correct solution, are dependent upon the principle that no one should be allowed to obtain a benefit growing out of his own wrongful act or perpetrated fraud.

Group No. 2 embraces cases of presumed undue influence. In such cases there is no proof of any actual undue influence, but there is proof of a fiduciary relationship and confidential relationship between the parties which enables the donee to exercise dominion and influence over the donor. In such cases, the courts have held that such relationship raised the presumption that the donee did

exert undue influence and the burden was on the donee to rebut such presumption, or, in other words, to negative undue influence—that means to prove that the gift or transaction was in fact the spontaneous act of the donor while acting under circumstances which enabled him to exert an independent will and justify the court in holding that the gift was the result of the free exercise of the donee's will.

The decisions of our Courts in which there are contained the characteristics of both groups (actual undue influence proved and also undue influence presumed from relationship) are: Bayliss v. Williams, 46 Tenn. 440; Martin v. Martin, 48 Tenn. 644; Turner v. Leathers, 191 Tenn. 292, 232 S. W. (2d) 269; Miller v. Proctor, 24 Tenn. App. 439, 145 S. W. (2d) 807; Roberts v. Chase, 25 Tenn. App. 636, 166 S. W. (2d) 641.

If we say the instant case cannot be supported by the first group because while the Lower Court and this Court, in its majority Opinion, each have found the fiduciary relationship and confidential relationship existed between Mrs. Wright and her niece Louise, but that the proof does not show that Louise actually exerted any undue influence or practiced any fraud upon Mrs. Wright, we of necessity must pass to the second group and determine if the proof brings this case within that group.

Does the proof show that there existed between Mrs. Wright and Miss Louise such a confidential or fiduciary relationship that enabled Louise to exert dominion and control over her?

The bill charges that there was such a relationship which gave Louise the complete ascendancy and control over Mrs. Wright, as would cause Mrs. Wright to turn

over to her the complete management of all of her business affairs. If we determine that all or any of the gifts were made at a time when Mrs. Wright was under the dominion and control of Louise and that the burden was cast upon Louise to negate or negative the acts of Mrs. Wright in making the gifts to her, as being the result of such dominion and control, and that Louise has failed to carry such burden, we would have to set aside such gifts as resulted therefrom.

The writer recognizes the fact that one way of proving undue influence is to show that the donor had the advantage of competent and independent advice with respect to such gifts. However, we must recognize the fact that to prove competent and independent advice was had by the donor, or that it was not had, is not the only way of disproving or proving the exercise of undue influence or the reverse. We also recognize the fact that relationship, that is, the blood tie alone, does not prove the existence of confidential relationship.

Now, with this understanding of the situation of the parties,—Miss Louise and Mrs. Wright,—from 1946 or 1947 until the death of Mrs. Wright in 1953, the proof as I understand it shows that Mrs. Wright was under the dominion and control in a legal sense of Miss Louise; that Miss Louise was her agent in attending to all of her financial affairs, arranging for her hospitalization, having her transported to and from her house and the hospital; apparently, Mrs. Wright's control over her business affairs was completely abandoned; that under the circumstances of her age, health, agency, etc., as hereinbefore set out, the gifts in 1951 must be presumed to be obtained by virtue of the dominion and control of Mrs. Wright by Miss Louise, and that she has failed

to overcome such presumption and to show any ratification by Mrs. Wright of any gifts other than those made prior to 1951 which permits her to retain them. It is the Opinion of the writer that she should be required to account for the $31,000 in gifts shown to have been made to her by Mrs. Wright in 1951, and to this extent the evidence preponderates against the decree of the learned Chancellor.

Another circumstance which to me, seems exceedingly relevant is the fact that the same year these gifts began to show up,—1947, Mrs. Wright executed her Will, on July 11th of that year, and she provided that Louise Lewis (Nicholas) should be paid by the Trustee out of the rents collected from the real estate passing to the Trustee in trust, $100 per month, and to Mrs. Mamie Rotrammel the sum of $100 per month, so long as either of them lived, except that if Mrs. Rotrammel should become a widow and remarry, then the payments to her would cease. In addition, she provided for special bequests and costs of administration of her estate, ''together with all the taxes of all kinds including State Inheritance Taxes and all Federal Estate Taxes and all other charges or expenses of any kind or character that may be charged against my estate out of my personal estate''. She bequeathed her household effects, silverware, and everything that was in her residence to Miss Louise and Mrs. Rotrammel equally; she bequeathed her diamond ring and diamond brooch to Miss Louise; she bequeathed her automobile to Miss Louise; she devised 156 acres of land to Miss Louise; she devised her home in Union City to Miss Louise and Mrs. Rotrammel for their respective natural lives.

On September 12, 1947, she executed the first Codicil to

her Will in which the only change she made with respect to a certain bequest to Prentice Wynn, in trust, for the use and benefit of Carolyn Wright Algee; and on November 12, 1947, she executed a second and last Codicil to her Will, in which she simply added Miss Louise and General Cates as joint Trustees with Harry Smith to hold the same portion of her estate in trust and for the same purposes as provided in the original Will. From this trust estate Miss Louise was to be paid the $100 per month first above mentioned. In neither Codicil did she increase any devise or bequest to Miss Louise and the gifts in 1948 were simply the completion of her expressed ideas and intentions originating in actual substance in 1947.

The $36,000 of annual rents disappearing from 1947 to 1953, when Mrs. Wright died, together with all this personal property which she intended would pay her taxes of every kind and costs of administration, at her death, and with her continued impairment, physically and mentally, and Miss Louise in charge of all her property and income, during those years, and with the further statement made by Miss Louise to Mrs. Prothro that she knew better than to take all the bonds without some contribution to General Cates and Mrs. Prothro, combined with the other facts and circumstances, make it impossible for me to find in this record where Miss Louise has overcome the presumption of invalidity of these gifts made in 1951.

I have read every word of this entire large record, examined every exhibit, and much of the evidence I have read three times. I can see no pattern set by Mrs. Wright in connection with the gifts made in 1948 and prior years to that of the gifts made to Miss Louise in 1951.