Ceben, J.
delivered the opinion of the court.
This bill is filed to recover back a tract of land of six hundred and forty acres, in Haywood county, which the complainant, Alston, sold and conveyed to defendant in 1832.
It appears, from the pleadings and proof, that, On the 4th of December, 1828, Alston and defendant agreed upon the exchangé of lands, and Alston executed a written memorandum to that effect. On the 2nd of November, 1829, the parties executed a written agreement, recognizing the said contract, and containing certain additional stipulations in relation thereto. On the 14th of July, 1832, Alston executed to Boyd a deed for the six hundred and forty acres of land now in dispute.
The articles of 1829 recite, that Boyd had before that time conveyed his lands in North Carolina, which were given in exchange to Alston.
The bill alleges, that, at the time these several contracts were made, the complainant was of unsound mind, and so’ continues to the present time.
The answer denies that the complainant was insane when the deed was made, and insists that the contract was fair, the property conveyed to the said Alston being a full and fair consideration for the land in question; and that the lapse of time has changed the circumstances of the parties, and the value of the property; and that the defendant has made valuable improvements upon the land in controversy; so that it is impossible to restore the parties to their former position.
Many depositions have been taken in North Carolina and in this State, of members of Alston’s family, of his near neighbors in North Carolina, and his physicians, and of lawyers who did business for him — the whole current of which proof is, that, from about the year 1825, his mind became diseased, and has continued so from that period until the present time.
It is true, it is proved by several respectable witnesses, who were his neighbors in North Carolina, and who had deal *506 ings with him during this period, that Alston, all this time, understood the value of property, was hard to trade with, and made some good contracts; and they think he was afflicted with hypocondria, but was not insane. But the body of the proof is, that, from 1825, he grew inattentive to his interest, managed his farm badly, and his property was diminished by his neglect and mismanagement. A large portion of the witnesses were of opinion that he was insane, among whom are his physicians and lawyers, and they say that such was the general opinion in his neighborhood. In confirmation of this opinion, they state that, about the year 1825, Alston became impressed with the belief that his house and beds were haunted with evil spirits, and would take the shovel and beat the ceiling of the house to drive them away; but not succeeding, he set fire to his house to destroy them and burned it up. Shortly after this, a Mr. Benton was compelled to take a peacé warrant against him, and while he was in jail, the court sent a committee to converse with him, one of whom enquired, whether he would injure Mr. Benton if he were turned out; he replied, that unless the spirits directed him to do so he would not, but that if he were so directed, he should obey God rather than man. He was told that, if he behaved so, the court would not release him; he replied, that it would be better for the court to release him otherwise he would call down fire from Heaven to consume them. He got a fancy that something was in his head that could be removed by an operation, and applied to his physician to open his head and remove it. He offered his slave his freedom if he would split his head open with an axe. He had a son born, and announced that he was Jesus Christ. He would dress his children in white, sprinkle them (as he said) with.holy water, that they might be taken to Heaven by Moses and Elijah. He imagined that his bowels had all disappeared and had sunk down to his legs.
These are some of the facts, which the concurrent testimony of many witnesses of the highest respectability establish; and upon these facts, there can be no doubt of the derangement of mind charged in the bill. This state of mind continued, with slight variation, so long as Alston resided in *507 North Carolina; and since his removal to Tennessee, a commission of lunacy has been awarded, and he is now under the control of a committee.
There is nothing in the record to oppose this view of the case, except the proof that he was in the habit of attending to his business, understood the value of property, and was hard to deal with.
There are few subjects about which so little can be certainly known, as the operation of the human mind. Questions of insanity, of the most embarrassing character, frequently arise. Men are often seen insane upon a given subject, while, upon other subjects, they are apparently sane. But it may be questioned, whether, in questions of monomania, the entire understanding is not, more or less, implicated in the disease. It often happens that the disease, which at first is developed in relation t.o some one subject only, soon becomes a case of general derangement of the.mind. I should be slow, therefore, to decide that a man, in any case of distinctly established monomania, was a responsible agent, bound by his acts or his contracts. Although it may be true, that his mind is peculiarly perverted upon some given subject, or class of subjects, and that unless excited by the introduction of these subjects, he may act rationally, yet it is impossible to tell how much influence his pervei’ted views upon this subject may have upon his mind, in relation to other matters. The case before us is an illustration of this remark.
The idea that evil spirits inhabited his house, induced Alston to lose all concern for the value of his property; that he might, by the destruction of the house, destroy also these spirits. So in relation to the idea that something was in his head; he was willing to give a slave his freedom, if he would split his head open.
Although, therefore, it may be that when none of these crochets came up, he may have had just notions of the value of property, yet it is impossible not to see that an individual taking advantage of these prevailing fancies, might have induced him to part with property without any consideration in the estimation of a sane man, but, in his judgment, for the attainment of the greatest good. Nor would his knowledge *508 of the value of property have, in the least degree, protected - him. The condition of his head was an evil, the removal of which would have been a good, greatly overbalancing any moderate amount of property. To have driven the evil spirits from about him, would have been a service, no ordinary sum of money could have adequately awarded.
The proof, therefore, of the ordinarily just estimate that Alston placed upon property, has very little weight on my mind, towards the establishment of his sanity; while the overwhelming evidence of the utter alienation of his mind, upon several other - subjects, satisfies me that he was not in a condition to make a valid contract, at the time the one before us was executed.
But it is insisted, in the answer and in the argument of the counsel, that there has been too much delay in making the objection to the sale to the defendant; that the friends of the ■ complainant should have put him under guardianship, and asserted his insanity at an earlier period.
To this it may be replied, that this negligence of friends shall not prejudice the rights of the complainant. They are not asking any thing; and the complainant was in no condition to know his rights and to assert them.
Upon the whole, we are of opinion that the contract between the parties be set aside; that an account be taken of the rents and profits of the land in controversy, allowing a reasonable compensation for improvements that have enhanced the permanent value of the land. The clerk will also report whether the lands conveyed by the defendant to the complainant have been conveyed to other persons; and, if so, he will state' the value thereof when conveyed, together with the rents and profits of the same from the time complainant got possession thereof. The defendant will have a lien upon the land in controversy, for the payment of any balance that may be due him upon the final settlement of the account.. Reverse the decree.