Ethelene **BROWN, Plaintiff-Appellant,**

v.

**Donald J. WEIK and wife, Carolyn H. Weik, Defendants-Appellees.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Oct. 3, 1983 [1].

Application for Permission to Appeal Granted March 19, 1984.

Permission to Appeal Held Improvidently Granted Feb. 11, 1985.

---

**1.** Designated for publication March 6, 1987.

Barret Ashley, S. Leo Arnold, Dyersburg, for plaintiff-appellant.

Melvin T. Weakley, Dyersburg, for defendants-appellees.

CRAWFORD, Judge.

This is an action by a 75–year old widow to set aside a deed of gift to a 6–acre tract of land. The plaintiff, Mrs. Etheline Brown contends that she did not have sufficient mental capacity to make the deed, and that she was subjected to undue influence by the defendants Donald J. and Carolyn Weik. The trial court sitting without the intervention of a jury found that the plaintiff was mentally capable of understanding her act, that the deed was made voluntarily, that plaintiff was not subjected to undue influence by the defendant, and plaintiff's suit was dismissed.

Plaintiff, in her brief, presented the following issues for review:

1. Whether a deed of gift should be set aside when the donor is in a weakened physical and mental condition and without the benefit of independent advice, and the circumstances indicate that the ·donees participated, encouraged and had a voice in the transaction.

2. Whether the acknowledgement of plaintiff's signature on the deed constituted full consultation and advice.

3. Whether the plaintiff should be granted a new trial on the grounds that (A) the trial court erred in refusing to allow lay witnesses to express their opinion of plaintiff's mental condition after stating facts to support their opinion; (B)

newly discovered and material evidence which could not have been obtained at trial by the exercise of reasonable diligence.

However, the issues can be narrowed somewhat, and we perceive them to be:

1. Whether the evidence preponderates against the findings of the trial court.

2. Whether the trial court erred in not permitting lay witnesses to testify as to their opinion as to Mrs. Brown's mental capacity.

3. Whether the trial court erred in failing to grant Mrs. Brown a new trial in order for her to present newly discovered evidence.

Our review of the record reveals the following:

Prior to October 4, 1979, Mrs. Brown owned 71 acres of land near Dyersburg on State Highway 104. On October 4, 1979, Mrs. Brown conveyed by deed a 6–acre tract of pasture land located between her home and the home of her neighbors, Donald J. and Carolyn H. Weik. A real estate broker in Dyer County was qualified as an expert appraiser of property values in the area and testified that the 6–acre tract had a 30 feet × 40 feet barn on it and had a fair market value of approximately $20,000 to $22,000 on October 4, 1979. Mrs. Weik, on the other hand, offered the opinion that the property was only worth approximately $3,000 to $5,000.

Lerlene Lewellyng, Mrs. Brown's 66–year old cousin from Newbern, Tennessee, which is approximately 10 to 12 miles from Dyersburg, testified that her parents were in the same nursing home where Mrs. Brown's brother lived and that she saw Mrs. Brown there every day up to the day that Mrs. Brown suffered a stroke, September 15, 1979. Mrs. Lewellyng testified that prior to her stroke Mrs. Brown had been taking care of her brother. She visited Mrs. Brown in the hospital after her stroke and observed that her speech was slow, that she was weak, that her face was drawn, and that she could not see well or walk without assistance. She particularly noticed that she had very little to say.

On October 10, 1979, after Mrs. Brown had been discharged from the hospital, Mrs. Lewellyng took her to Memphis to visit her brother in the hospital. She appeared confused and disoriented at this time. Some time later, Mrs. Lewellyng assisted Mrs. Brown in completing her medicaid forms to pay for her hospital costs incurred while being treated for her stroke, because Mrs. Brown apparently did not know how to complete the forms, although she had always conducted her own business in the past.

Marshall Williams, the 62–year old housekeeper at Parkview Hospital in Dyersburg, testified that he had known the plaintiff since he was 10 years old and that he visited her in September and October, 1979, both before and after Mrs. Brown was hospitalized and discharged. He noticed that her condition after she was hospitalized was substantially different than before the time she entered the hospital because she didn't talk and "didn't really know anything."

Mrs. Brown's 62–year old niece from Huntsville, Alabama, Hazel Marchant, testified that she saw Mrs. Brown on an average of three times per year and that she saw her three months prior to the death of Mrs. Brown's brother in October, 1979. At that time Mrs. Brown appeared to be mentally alert and active, but the next time she saw her on October 11, 1979, she was unstable and needed assistance to walk.

Karon Elam testified that she was a cousin of Mrs. Brown and that she lived in Memphis, but tried to see her once a month. She testified that prior to her hospitalization for the stroke she was deteriorating physically, but that she noticed a marked difference in Mrs. Brown's physical condition after she was hospitalized. Mrs. Brown could not speak plainly, her speech was slurred, she could not see well out of one eye, and she was unresponsive to questions. Irene Brown, another elderly distant relative of Mrs. Brown, substantially echoed the testimony of Mrs. Elam.

Evie Robins testified that she was not related to Mrs. Brown, but that she had been a close friend of Mrs. Brown for 30

years. She was employed at the nursing home where Mrs. Brown's brother resided and saw Mrs. Brown in the hospital in September, 1979, when she was being treated for the stroke. Mrs. Brown did not recognize her when she came to visit her in the hospital, nor did she recognize Mrs. Robins when she visited her at home after her brother had died. Mrs. Robins testified that Mrs. Brown apparently could not remember things as well as she could prior to her stroke.

Plaintiff, Mrs. Etheline Brown, testified that she was 78 years old at the time of trial in 1982, and that she had been a widow since 1954. She testified that she was exhausted from trying to care for her brother who was in a nursing home and that as a result she suffered a stroke and was hospitalized from September 15 to September 23, 1979.

On the day that she was hospitalized she attempted to call a neighbor who lived down the highway from her, but she was unable to reach her. Mrs. Brown then called Mrs. Weik, and told her that she was "sick as a horse." Mrs. Weik came to the home of Mrs. Brown and attempted to feed her and then offered to take her home with her. Mrs. Brown asked her to take her to the hospital instead.

Mrs. Weik did take Mrs. Brown to the hospital where she was treated for a stroke and was released approximately one week later.

Mrs. Brown testified that she had no recollection of transferring the property to the Weiks, nor did she have any recollection of any of the events or circumstances surrounding the transfer of the property to the Weiks, including visiting her attorney and requesting a survey of the property. She testified that the first notice that she had that the Weiks claimed ownership of the property occurred in the spring of 1980 when the Weiks began to plant a garden on the property. She learned from the county register's office that the Weiks had in fact recorded a deed to the property. She claimed that the Weiks had an agreement with her that they would mow the pasture in exchange for a portion of her pecan crop

of 1980. She also maintained that the Weiks "quit me pretty quick after this 4th of October deal."

Donald J. Weik testified that the Weik family home was located approximately 500 yards from the home of Mrs. Brown, and that he had purchased his homeplace from Mrs. Brown in 1965 or 1964. The 6 acres in dispute were located between Mrs. Brown's property and his property except for a 15 foot roadway easement. The Weiks had two teenage sons who enjoyed riding a three-wheel motorcycle and a Honda "dirt bike," and Weik inquired of Mrs. Brown whether he could rent the pasture from her in order for the children to have a place to ride their motorcycles. According to Mr. Weik, Mrs. Brown refused to take any rent but allowed them to ride the bikes in the pasture.

Mr. Weik could not recall the exact date, but upon Mrs. Brown's return from the hospital she called the Weiks one evening and requested that they come see her regarding the pasture. The Weiks drove to Mrs. Brown's home and found her in bed where she told them that she wanted them to have the pasture as a gift because she had for many years intended that their children would one day have the property. He testified that they have paid the insurance premiums on the barn and taxes on the property since the property was deeded to them in October, 1979, and that they have mowed and maintained the property since that time. He denied that they had any agreement regarding the pecan crop and stated that they gratuitously maintained Mrs. Brown's land. He testified that, to his knowledge, no money was transferred to Mrs. Brown in exchange for the property, and that he was "shocked," but did not think it was unusual, when she offered to give the property to them as a gift.

Carolyn H. Weik testified that they had used the pasture since May, 1979. She substantially corroborated Mrs. Brown's version of the events of the day that she took Mrs. Brown to the hospital, with the minor variation that it was her idea to take Mrs. Brown to the hospital and not Mrs.

Brown's idea. As she and her son were helping Mrs. Brown to the car through Mrs. Brown's kitchen, Mrs. Brown instructed Mrs. Weik to remove a brown paper bag containing bonds of an unknown value and certificates of deposit worth approximately $60,000 from the refrigerator and told her "its yours until you're better paid." She testified that upon Mrs. Brown's release from the hospital on September 23, 1979, the Weiks brought Mrs. Brown back to her home after she had declined their invitation to stay at their home while she was recuperating. While Mrs. Brown was recuperating Mrs. Weik saw her on the average of two times per day and took her many places, including the grocery store and the beauty parlor.

Mrs. Weik testified that she called James Elgin and requested that he make a survey of the property at Mrs. Brown's instruction. Elgin made a survey of the property but refused to accept payment from Mrs. Weik for his services. She also testified that she contacted Mrs. Brown's attorney, A.D. Walker, and requested that he draw up a deed to the property and that ·Mr. Walker responded that Mrs. Brown had already contacted him regarding the matter.

Mrs. Weik took Mrs. Brown to attorney Walker's office on the afternoon of October 4, 1979 and testified concerning this occasion:

[Mrs. Weik] Mr. Walker asked her how she had been, just normal greetings, and then he read this Deed over to her and asked her if she thoroughly understood it, and she said she did and she signed it. He told her to sign it and then Mr. Walker stamped it.

Question: You mean notarized it?

Answer: Yes, sir.

Question: And then did you pay for the deed?

Answer: Yes, I did.

Finally, Mrs. Weik testified that on more than one occasion since she deeded the property to them, Mrs. Brown had offered to buy back the property, suggesting that Mr. Weik was too old to maintain it.

Regarding the actual execution of the deed, A.D. Walker, a 63–year old lawyer who had practiced in Dyer County for 34 years, testified that he had prepared deeds before for Mrs. Brown and that she was a person with a "positive" mind. He testified that she called him and asked him to prepare the deed and that he told her that he would need a legal description of the property in order to prepare it properly. He could not recall who actually called him for preparing the deed, and who gave him the exact legal description of the property, but one was obtained nonetheless.

Walker gave the following account of the events of October 4, 1979:

Answer: On that occasion—I mean, like I say, I don't know where the description came from. I don't know whether I got it or how I got it, but I did get it and prepared the Deed. As I recall, Mrs. Brown—Mrs. Weik, I think, brought Mrs. Brown to my office in the car. Mrs. Weik came in the office and I went out to the car and took the Deed for Mrs. Brown to sign there.

Question: And before she signed it what conversation did you have with her?

Answer: I had a very short conversation, and I believe Mrs. Brown told me that she had been sick on that occasion, told me she had been sick for awhile, and I discussed the Deed with her.

Question: When you say discussed the Deed, did you read it to her?

Answer: The description of it. I don't recall reading the Deed to her, but I do recall—and I usually ask my clients—do you acknowledge that you have executed this Deed for the purpose therein contained and that you realize that you are parting with it for good.

Question: Did you ask Mrs. Brown that on that occasion?

Answer: I did.

Question: And did she say she did?

Answer: Yes, she said she did.

Question: All right. Now, Mrs. Brown alleges in her Complaint, Mr. Walker, that she has no recollection whatsoever, no knowledge of existence of this Deed until she filed the lawsuit about

two years later. Is there any doubt in your mind she knew what business she was about and what property she was conveying?

Mr. Ashley: If the Court please, we're going to object to that as leading the Witness.

The Court: Yes, sir, I'll sustain that.

Question: (By Mr. Weakley) Mr. Walker, state to the Court whether or not Mrs. Brown understood the business that she was about at the time she signed her name to the Deed after you did what you said.

Mr. Ashley: Well, we object to that. There's no way for Mr. Walker to know whether she understood or didn't understand.

The Court: Just tell everything that occurred between the two conversations.

Answer: (By the Witness) As far as I could tell and in talking with Mrs. Brown, her mind was all right. Mrs. Brown has always been a woman of very positive [sic] and stated what she wanted to do. As far as I could tell, her mind was all right and she understood what she was doing, otherwise I would not have acknowledged the signature. If I had thought Mrs. Brown's mind was bad I wouldn't have acknowledged the signature.

Walker was unaware that Mrs. Brown had been in the hospital, and the following excerpt is the sum of the advice he gave her on the day of the execution of the deed:

I didn't give her any advice. I just had a few words of greetings, pleasantries, and then told her I had the Deed for herself and Mr. and Mrs. Weik and asked her, like I said, asked her if she wanted to sign it and if this was what she wanted to do. After she had signed it I asked her if she acknowledged that she executed this Deed for the purpose therein contained and she understood that she was parting with this property.

## ISSUE NO. 1

Whether the evidence preponderates against the findings of the trial court.

■ Plaintiff asserts that she was suffering from mental and physical disability to such an extent that she had no recollection at all of discussing the gift of the land to the defendants, nor of executing the deed in completion of the gift. In order for a deed to be valid it must be the conscious, voluntary act of the grantor and a deed executed when the grantor is mentally unbalanced, when he has no intelligent comprehension of the act being performed and when he is incapable of transacting is void. *Hinton v. Robinson*, 51 Tenn.App. 1, 9, 364 S.W.2d 97, 100 (1962). There is no question but that the plaintiff suffered a stroke shortly before the gift was discussed and the deed executed. She testified that she had no recollection of either event, but only learned of the deed's existence at a later time which she thinks was in the spring of 1980.

Various witnesses testified on behalf of plaintiff that she was in a weakened physical condition after she suffered the stroke, and the stroke coupled with the death of her brother left her in a seemingly confused mental state. However, the deed in question was prepared by A.D. Walker, a lawyer in Dyersburg, Tennessee, who also acted as the notary public taking the acknowledgement from Mrs. Brown. The testimony was quite clear that he had had many dealings with the plaintiff through the years, and that while she was somewhat physically incapacitated she seemed to have a clear mind and understood the purpose of the deed. Mr. Walker had handled real estate transactions for the plaintiff in the past and his observation was that she appeared no different on this occasion.

Plaintiff also asserts that she was in a weakened physical and mental condition and that undue influence was exerted by the defendants which resulted in the gift to them.

■ Transactions in which a gratuitous benefit is conferred on a party by another are void if the recipient exercised undue influence to obtain it. *Simmons v. Foster*, 622 S.W.2d 838, 840 (Tenn.App.1981).

■ The doctrine of undue influence applies when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship. Only *undue* influence is prohibited. *Parham v. Walker*, 568 S.W.2d 622, 624 (Tenn.App.1978). An abuse of confidence and an exercise of domination and influence must be shown, the mere existence of a confidential or fiduciary relationship is not sufficient to show undue influence. *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn.1977).

■ The burden is on the one who claims the existence of the confidential relationship to prove it. *In re Estate of Rhodes*, 222 Tenn. 394, 406, 436 S.W.2d 429, 435 (1968); *Parham v. Walker, supra* at 624. Once a confidential relationship has been proved, undue influence is presumed, and the burden shifts to the recipient to prove the fairness of the transaction and the nonexistence of undue influence, such as through independent advice. *Parham v. Walker, supra* at 624; *Miller v. Proctor*, 24 Tenn.App. 439, 446–447, 145 S.W.2d 807, 811 (1940). The presumption of invalidity is rebuttable by clear and convincing evidence of the transaction's fairness. *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn.1977); *Simmons v. Foster, supra* at 840–841.

■ One way to prove the fairness of the transaction is to show that the grantor had the benefit of competent, independent advice on the advisability of making the gift or conveyance. *Richmond v. Christian, supra* at 107–108. This advice need not be contemporaneous with or immediately preceding the gift. *Nicholas v. Wright*, 42 Tenn.App. 241, 262, 301 S.W.2d 540, 549 (1956). The content and extent of independent advice necessary to overcome the presumption of invalidity was discussed in *Turner v. Leathers*, 191 Tenn. 292, 232 S.W.2d 269 (1950), where Justice Prewitt wrote:

"Proper independent advice in this connection means that the donor had [preliminary] benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefactions."

*Turner v. Leathers, supra* at 297–298, 232 S.W.2d at 271.

A necessary predicate to the application of the doctrine of undue influence is the existence of a confidential relationship. The exact contours of what constitutes a confidential relationship are not susceptible to precise legal definition. As Judge Sanders has observed: "Although our courts have not defined very clearly the elements which must be present for a confidential relationship to exist, it appears that any relation of confidence between persons which gives one domination over the other falls within the category." *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn.App. 1974).

In *Massey v. Pemberton*, 54 Tenn.App. 342, 390 S.W.2d 709 (1964), the court found that a confidential relationship existed in light of the following facts:

As is seen from the foregoing statement of facts, we have for consideration the rather unusual and unique situation of a man seventy-five years old, in poor health, the father of nine children and a number of grandchildren, who, without monitary consideration, and without any mutual promise of future companionship or assistance on the part of the transferee, made a deed to his home place, worth approximately $10,000.00, which was the only property of any value that he possessed in the world, thus, leaving himself impoverished and without any means of livelihood or income except $55 a month Social Security benefits which he also gave to his sister-in-law, the defendant, to be used in paying on the mortgage indebtedness of some $1,500.00 and other expenses ...

As hereinabove indicated no rational or reasonable explanation as to why Mr. Massey chose to denude himself of his entire estate in favor of a sister of his deceased wife to the exclusion of his own

children, who, according to the finding of the Chancellor with which we agree, had shown normal affection and attention to him throughout the years.

*Id.* at 350, 390 S.W.2d at 712–713 (1964).

■ Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

■ Any conflict in testimony requiring a determination of the credibility of witnesses is for the trial court and is binding on the appellate court, unless other real evidence compels a contrary conclusion. *State ex rel. Balsinger v. Town of Madisonville*, 222 Tenn. 272, 282, 435 S.W.2d 803, 807 (1968); *Linder v. Little*, 490 S.W.2d 717, 723 (Tenn.App.1972).

■ The record in the case before us is clear that the relationship between the defendants and the plaintiff was nothing more than the ordinary neighborly relationship found in a multitude of communities in our area of the country. We find it difficult to label the relationship between these parties as confidential or fiduciary. The court below found that the plaintiff was mentally capable of understanding her act, that the deed was voluntarily made, and there was no undue influence exerted by the defendant to accomplish the gift involved. We cannot say that the evidence preponderates against these findings of the trial court. Accordingly, the first issue and the assertions of the plaintiff therein are without merit.

### ISSUE NO. 2

Whether the trial court erred in not permitting lay witnesses to testify as to their opinion as to Mrs. Brown's mental capacity.

■ Plaintiff asserts that the trial court would not allow lay witnesses to give an opinion of her mental capacity at the time in question. The record is confusing and it is not exactly clear what ruling was made by the trial court. There were many needless objections and colloquy between counsel and between counsel and the court—primarily on the part of defendant's counsel—which makes it difficult to actually comprehend the clear import of the testimony. However, after reviewing the record we feel that much opinion evidence was introduced by these lay witnesses, but apparently they were not questioned concerning their opinion of plaintiff's mental capacity based upon the proper foundation of facts and circumstances. Clearly, after the proper foundation of reasonable and substantial facts upon which to base an opinion has been laid, a lay witness may testify as to his opinion of another's mental capacity or incapacity. *See Schlickling v. Georgia Conference Association Seventh-Day Adventists*, 49 Tenn.App. 412, 480, 355 S.W.2d 469, 499 (1961) (*see also*, the discussion at 429–437 and 355 S.W.2d at 477–478; *Hamlin & Allman Iron Works v. Jones*, 200 Tenn. 242, 246, 292 S.W.2d 27, 29 (1956). No offer of proof was made and with the state of the record before us we cannot find error on the part of the trial court. Accordingly, this issue and the assertions of the plaintiff are without merit.

### ISSUE NO. 3

Whether the trial court erred in failing to grant Mrs. Brown a new trial in order for her to present newly discovered evidence.

Mrs. Brown filed a "Motion for New Trial or to Amend Findings and Judgment" in which she alleges, among other grounds for a new trial, that:

10. Newly discovered and material evidence, discovered since the trial, and which could not have been obtained at the trial by the exercise of reasonable diligence, which evidence is set out in the affidavit of James Elgin, W.I. Thornton, M.D., and J.R. Reynolds, M.D., attached hereto and made a part hereof.

In his memorandum supporting this motion, counsel for Mrs. Brown makes what could be a persuasive argument that Mrs. Brown's lack of recollection of the events that occurred immediately after her stroke made preparation of the case for trial extremely difficult. However, these allegations are made in the most conclusory terms without the requisite particularlity,

and the persuasiveness of the argument diminishes upon examination of the record. Two of the affiants—James Elgin and W.I. Thornton, M.D.—were mentioned by name during the trial. Elgin surveyed the property for the description in the deed. Thornton had treated Mrs. Brown occasionally and was her treating physician when she was hospitalized after her stroke. Both of these individuals were discussed at trial, and no explanation was given for why they did not testify at trial. The natural and logical witness to testify regarding her mental capacity would have been her treating physician.

In his memorandum supporting the motion counsel for Mrs. Brown alleged:

The significance of the role played by Dr. Reynolds was unknown until after the trial despite the efforts of counsel to ascertain from Mrs. Brown all her relevant medical history.

It is important to note that counsel does not contend that he was unaware of Dr. Reynolds' treatment of Mrs. Brown, but only that he was unaware of the *significance of the role* played by Dr. Reynolds.

A new trial will be granted on account of newly discovered evidence only when it is evident that an injustice has been done and a new trial will change the result. *Diversified Equities, Inc. v. Warren,* 567 S.W.2d 171, 175 (Tenn.App.1976). In ruling on a motion for new trial on the grounds of newly discovered evidence the trial court is vested with wide discretion, and its denial of such a motion will not be disturbed by an appellate court unless it has abused its discretion. *Evans v. Evans,* 558 S.W.2d 851, 853 (Tenn.App.1977). In exercising its discretion, the trial court must consider the rights and diligence of the parties as well as the integrity of the court as a fact finding body.

In *Tipton v. Smith,* 593 S.W.2d 298 (Tenn.App.1979), the court held that the trial court properly denied a motion for a new trial when the party failed to procure evidence that with ordinary diligence he might have procured prior to trial. *Id.* at 302. The court also cited *Monday v. Millsaps,* 37 Tenn.App. 371, 264 S.W.2d 6 (1953), for the proposition that newly dis-

covered opinion or expert testimony cannot be the basis for granting a new trial. *Monday v. Millsaps, supra,* in turn relies upon *Kannon v. Galloway,* 61 Tenn. 230 (1872), in which the Supreme Court stated:

Kannon states in an affidavit that he did not know that he could prove the facts by those witnesses stated in their affidavits, until after the verdict of the jury was rendered, except as to one of them, whose attendance he could not procure. Why he could not procure the attendance of the affiant last referred to is not stated; nor is it stated that there were not other experts by whom he could have proved the same facts, whose attendance he could have procured.

There was much testimony upon the trial *pro* and *con* upon the genuineness of the signature to the notes sued on; *non est factum* being in fact the only plea pleaded by defendant below. The affidavit does not show that any effort was made to procure the evidence of experts and we do not think that these affidavits show any sufficient reasons why this Court should reverse in order that plaintiff in error should have a new trial.

*Id.* at 231.

Rather than standing for the flat rule that expert testimony cannot be the basis for granting a new trial, we believe that this case stands for the unremarkable proposition that in order to prevail on such a motion the moving party must show specifically why he was unable to procure the "newly discovered" evidence and that he exercised due diligence in attempting to obtain the evidence prior to trial.

On the record before us we cannot say that the trial court abused its discretion in refusing a new trial on the ground of newly discovered evidence.

Accordingly, the judgment of the trial court is affirmed, the case is dismissed, and the costs of the appeal are adjudged against the appellant.

TOMLIN, J., concurs.

HIGHERS, J., dissents.

HIGHERS, Judge, dissenting.

Because the majority opinion does not satisfactorily deal with the effect of weak-

ness of mind upon donative intent, I must respectfully dissent.

It is undisputed that the plaintiff suffered a stroke on September 15, 1979, and less than three weeks thereafter conveyed the property in question to the defendants. The defendants employed the surveyor, talked with the lawyer who prepared the deed, transported the elderly plaintiff to the lawyer's office for execution of the deed, and immediately recorded the deed at the Register's Office. At the lawyer's office the plaintiff was physically unable to go inside, and the lawyer had to come out to the automobile in order to take her acknowledgment.

The majority opinion recognized that incapacity may invalidate a transfer, but it goes on to discuss undue influence, dealing at length with confidential relationships and independent advice. I agree that the evidence does not preponderate in favor of the plaintiff's theory of undue influence.

What the majority opinion fails to recognize, however, is that donative intent, separate and apart from the issue of undue influence, is an essential element of an *inter vivos* gift and that the burden of proof is on the donee. *First National Bank v. Howard*, 42 Tenn.App. 347, 302 S.W.2d 516 (Tenn.App.1957). Doubts must be resolved against the gift. *Pamplin v. Satterfield*, 196 Tenn. 297, 265 S.W.2d 886 (Tenn.1954). In 38 C.J.S. *Gifts* § 13, the general rule is stated that "the donor shall have sufficient mental capacity to make a gift; a gift by a donor mentally incompetent is void." Later, although it is said that "[n]either age, nor physical weakness and debility ... nor even mental weakness, will affect the validity of a gift, where the donor has sufficient intelligence to understand the nature and effect of his act," a footnote points out that "[w]hile mental weakness is not of itself sufficient to overturn a gift, it may warrant the conclusion that the donor did not have the requisite intention to make a gift." 38 C.J.S. *Gifts* § 13, citing *Collins v. Baxter*, 231 Ala. 247, 164 So. 61. In *Alston v. Boyd*, 25 Tenn. 504 (Tenn.1846), the disease of monomania

was found to incapacitate the plaintiff so as to make his contracts void, even where there was no allegation of undue influence.

The majority opinion and the trial court apparently rely most heavily upon the testimony of the lawyer who prepared the deed, notwithstanding the brevity of the occasion, the limited opportunity for observation of the plaintiff, the fact that he had only "a very short conversation" with her, and that he was generally unaware of her physical and mental condition at the time of the transaction.

There was more than ample uncontradicted testimony from those who were in a position to observe the plaintiff at close range, both before and after the onset of her illness, to show the effect of her mental weakness upon donative intent at the time of this transfer. Based upon the proof which has been outlined in the majority opinion, especially in paragraphs 4 through 15, I would hold that the defendants had failed to prove donative intent on the part of the plaintiff and that the evidence clearly preponderates against the finding of the trial court in this respect.