IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 20, 2004 Session

## BILL GIBSON, ET AL. v. JIMMY L. GIBSON

**A Direct Appeal from the Chancery Court for Tipton County**
**No. 19,034     The Honorable Dewey C. Whitenton, Judge**

---

**No. W2004-00005-COA-R3-CV - Filed November 2, 2004**

---

Appellants sought the rescission of a quitclaim deed from a mother to her son upon the grounds of undue influence, fraud, and lack of independent advice. The trial court found that the quitclaim was not invalid on any of these grounds. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

T. D. Forrester, Covington, For Appellants, Bill Gibson, Clyde Gibson, Vivian Gibson Summar, Pam Gibson Clark, and Robert J. Gibson, Jr.

J. Thomas Caldwell, Ripley, For Appellee, Jimmy L. Gibson

**OPINION**

Clyde Gibson, Sr. and his wife, Blanche F. Gibson were the owners of approximately 150 acres of farmland upon which they resided (the "Land"). Clyde and Blanche Gibson had four sons: Clyde Gibson, Robert Gibson, Bill Gibson and Jimmy Gibson. Clyde Gibson, Sr., with the help of his sons, farmed the land until shortly before his death in 1963. At that time, and with the assistance of Jimmy Gibson ("Defendant," or "Appellee"), Clyde Gibson, Sr. leased the Land for farming.

Robert Gibson, Clyde Gibson, and Jimmy Gibson all received lots out of the farm and built houses on their lots and lived in close proximity to their mother after the death of their father. Bill Gibson has lived in Memphis since 1971. In July 1993, Robert Gibson predeceased his mother. Robert Gibson had three children: Vivian Gibson Summar, Pam Gibson Clark, and Robert Gibson, Jr. (together with Bill Gibson, and Clyde Gibson, "Plaintiffs," or "Appellants").

At the time of Clyde Gibson. Sr.'s death, Blanche Gibson's only source of income was the farm rental proceeds. After his father's death, Jimmy Gibson handled all aspects of the farm leasing arrangements from the mid-60s until the mid-80s. During this period, Jimmy Gibson negotiated and made arrangements for the leasing of the Land, monitored the leases, and terminated leases when he deemed it necessary. During the period when the Land was being rented to outside tenants, the only mortgage indebtedness on the Land was a Deed of Trust, dated January 1972, from Blanche Gibson to Union Savings Bank, securing an indebtedness in the amount of $5,388.00.

In approximately1985, Jimmy Gibson began farming the Land himself. Jimmy Gibson made annual rental payment of one-third or one-fourth of the net crop to his mother. Jimmy Gibson farmed the Land from approximately 1985 through the crop year of 1993. At the time Jimmy Gibson began farming the Land, Blanche Gibson was approximately 73 years old. After the 1993 crop, Jimmy Gibson leased the Land to the Kelly family.

On April 23, 1984, Blanche Gibson incurred mortgage indebtedness of $10,761.00 to Union Savings Bank. On December 8, 1986, Blanche Gibson incurred mortgage indebtedness to Union Savings Bank in the amount of $20,000.00. Bill Rice, a former loan officer and employee of Union Savings Bank, testified that the December 8, 1986 mortgage indebtedness was a renewal of the April 23, 1984 indebtedness, with additional funds being advanced. Bill Rice stated that the December 30, 1988 $10,000.00 mortgage indebtedness would have been new funds because this was a second mortgage on the Land.

On February 2, 1993, when she was 81 years old, Blanche Gibson was injured in a car accident. From that point on, her health began to gradually deteriorate until she was placed in a nursing facility in 1999. She remained there until her death on June 28, 2000.

During early 1994, Jimmy Gibson contacted Union Savings Bank and requested a loan to purchase the Land. Jimmy Gibson did not notify Blanche Gibson's other heirs of his desire to purchase the Land. Donna Gibson, the widow of Robert Gibson, Sr., received information that Jimmy Gibson was attempting to obtain the Land and she notified Bill Gibson. Bill Gibson met with his mother in an attempt to find out the status of the matter. As a result of this conversation with his mother, Bill Gibson arranged a meeting in the Spring of 1994 with Union Savings Bank President, Barnett Hall, Clyde Gibson, Jimmy Gibson, and Blanche Gibson. Bill Gibson and Barnett Hall testified that, at this meeting, Blanche Gibson appeared to understand the situation and her options concerning the Land. At that time, it was decided that Blanche Gibson would retain the Land and that the yearly rental check from the Kelly family would be sent directly to the bank, with a portion thereof going to service Blanche Gibson's indebtedness to the bank and the remainder being deposited into Blanche Gibson's personal account.

In October of 1994, Jimmy Gibson contacted the law office of Michael Acree, in Covington, Tennessee, to prepare a Quitclaim Deed (the "1994 Quitclaim") from Blanche Gibson to Jimmy Gibson, with Blanche Gibson reserving a life estate. Stacy Northcott, Mr. Acree's assistant/paralegal, testified that she usually met with Mr. Acree's clients on routine matters and

would prepare and handle the preparation of simple deeds, such as the 1994 Quitclaim. On October 17, 1994, Jimmy Gibson and his son, "Little Jimmy" Gibson, brought Blanche Gibson to Mr. Acree's office. Blanche Gibson executed the 1994 Quitclaim in the presence of Stacy Northcott, Jimmy Gibson, and "Little Jimmy" Gibson. Stacy Northcott testified that she informed Blanche Gibson what the document purported to do and that Blanche Gibson understood what she was signing. The 1994 Quitclaim was recorded in the Register's Office of Tipton County on October 18, 1994.

Blanche Gibson continued to make loans on the Land through 1998. In late 1998, Blanche Gibson's health had deteriorated to the point that she was placed in a nursing home.

On July 30, 1999, Blanche Gibson signed a second Quitclaim Deed (the "1999 Quitclaim"), by which she released her life estate in the Land. The 1999 Quitclaim was recorded on August 2, 1999.[1]

Blanche Gibson died in 2000. Billy Gibson testified that he knew nothing of the quitclaim deeds until he and Jimmy Gibson went to the bank to make arrangements for their mother's funeral. He testified that he was shocked to learn that the Land had been deeded to Jimmy Gibson several years earlier.

On November 13, 2000, the Appellants filed a Complaint against Jimmy Gibson. The Complaint specifically averred that the 1994 Quitclaim was executed without the benefit of independent advice as a result of the fraud and undue influence of Jimmy Gibson, and was executed without consideration and at a time when Blanche Gibson was advanced in age and suffered from physical and mental weaknesses. The Appellants further alleged that the 1994 Quitclaim was contrary to Blanche Gibson's expressed intentions and resulted in an unnatural disposition, which occurred while there was a confidential relationship between Jimmy Gibson and his mother. Appellants were allowed to amend their Complaint on April 10, 2003 to specifically aver that the 1994 Quitclaim was the result of the fraud of Jimmy Gibson as to the value of the Land and the misrepresentation that the Land was in jeopardy of being foreclosed by Union Savings Bank. On November 28, 2000, Jimmy Gibson answered the Complaint, asserting that his mother was competent to convey her interest in the Land, that he was not guilty of fraud or misrepresentation, that there was no confidential relationship between he and his mother, and that the transfers were not the product of undue influence.

A non-jury trial was held on August 18 and 19, 2003. Following the hearing, the trial court entered its "Final Decree" and "Trial Opinion," on November 24, 2003. As to the 1994 Quitclaim, the trial court made the following, relevant findings:

---

[1] Dr. Cannon, Blanche Gibson's treating physician, testified that Blanche Gibson was not competent to execute this 1999 Quitclaim. Consequently, the trial court found that it was void and of no effect. There is no appeal from this ruling. Therefore, the 1994 Quitclaim is the only transaction at issue in this appeal.

1. Dr. Jesse J. Cannon, Jr. M.D. testified that Ms. Gibson would have been competent at the time she executed the deed.
2. Stacy Northcott, the legal secretary of Mike Acree who prepared the deed and notarized it, testified that Ms. Gibson was competent at the time she signed the deed.

\*                              \*                              \*

The Court, after considering all of the credible evidence in the cause, finds by a preponderance, or the greater weight, of the evidence, that the plaintiffs have been unable to prove and establish: (1) fraud; (2) undue influence; (3) a confidential relationship, other than the normal parent and child relationship; (4) the exercise of dominion and control by the defendant over his mother; and (5) that the execution of the 1994 deed was not the conscious and voluntary act of Blanche Gibson, and was performed under such a cloud of misunderstanding and mistake as to render her assent invalid.

The Court further finds that the advice of Barnett Hall and Bill Rice to Blanche Gibson did constitute independent advice. Appellants appeal and raise four issues for review as stated in their brief:

1. The trial court erred in finding that a confidential relationship did not exist between Blanche Gibson and Jimmy Gibson other than the normal parent/child relationship.

2. The trial court erred in not finding there were numerous suspicious circumstances with and/or in addition to the confidential relationship between Blanche Gibson and Jimmy Gibson in order to establish or create a presumption of undue influence.

3. The trial court erred in finding that Blanche Gibson had received independent advice from Barnett Hall and Bill Rice.

4. The trial court erred in not finding the 1994 Quitclaim Deed (Exhibit 9) to be null and void because Jimmy Gibson's fraud and the fact that the Quitclaim Deed was not a product of a voluntary and conscious act of Blanche Gibson.

The existence of a confidential relationship and the exercise of undue influence are questions of fact. *Clark v. Perry*, No. No. 02A01-9704-CH-00080, 1998 Westlaw 34190562, at \*4 (Tenn. Ct. App. Mar. 19, 1998) (citing *Fritts v. Abbott*, 938 S.W.2d 420, 421 (Tenn. Ct. App.1996)). Accordingly, our review of these issues is *de novo* upon the record, accompanied by a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the

truthfulness of witnesses, the trial judge, as the trier of fact, has the opportunity to observe the witnesses in their manner and demeanor while testifying and is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App.1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id.*; *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn.1997).

In the instant case, the Appellants assert that Jimmy Gibson exercised undue influence over Blanche Gibsons in the procurement of the 1994 Quitclaim on numerous grounds, including: (1) the existence of a confidential relationship between Jimmy Gibson and Blanche Gibson; (2) Blanche Gibson's physical and mental deterioration and her advanced age; (3) Jimmy Gibson's involvement in procuring the Quitclaim and his secrecy surrounding it; (4) the unjust and unnatural terms of the Quitclaim; (5) a lack of independent advice; and (6) fraud.

The doctrine of undue influence applies "when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship." *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App.1983). A party seeking to rescind a deed based on this doctrine has the burden of proving (1) that a confidential relationship existed between the parties wherein the grantee was the dominant party, and (2) that the transaction conferred a benefit on the grantee. *Matlock v. Simpson*, 902 S.W .2d 384, 386 (Tenn.1995); *Fritts v. Abbott*, 938 S.W.2d 420, 421 (Tenn. Ct. App.1996); *Williamson v. Upchurch*, 768 S.W.2d 265, 269 (Tenn. Ct. App.1988); *Parham v. Walker*, 568 S.W.2d 622, 624 (Tenn. Ct. App .1978). Once the party proves these elements, a presumption arises that the deed was procured by undue influence. *Brown v. Weik*, 725 S.W.2d at 945; *Parham v. Walker*, 568 S.W.2d at 624. The burden then shifts to the grantee to prove, by clear and convincing evidence, that the transaction was fair and was not the result of undue influence. *Matlock v. Simpson*, 902 S.W.2d at 386; *Brown v. Weik*, 725 S.W.2d at 945; *Parham v. Walker*, 568 S.W.2d at 624. If the grantee fails to carry this burden, the transaction is presumed void. *Id*.

Concerning confidential relationships between a parent and child, our Supreme Court, in *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn.1977), held that a normal relationship between a mentally competent parent and an adult child is not per se a confidential relationship and it raises no presumption of invalidity of the transaction   Nonetheless, confidential relationships can assume a variety of forms. *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App.1989). Accordingly, courts have been hesitant to provide a precise definition for the term "confidential relationship." *Id*.; *accord Williamson v. Upchurch*, 768 S.W.2d at 269; *Brown v. Weik*, 725 S.W.2d at 945. Generally, a confidential relationship includes any relationship of trust and confidence which gives one party dominion or influence over the other. *Mitchell v. Smith*, 779 S.W.2d at 389; *Williamson v. Upchurch*, 768 S.W.2d at 269. More specifically, a confidential relationship is one "where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the

weaker or dominated party." ***Iacometti v. Frassinelli***, 494 S.W.2d 496, 499 (Tenn. Ct. App.1973); ***accord Mitchell v. Smith***, 779 S.W.2d at 389; ***Williamson v. Upchurch***, 768 S.W.2d at 269.

Although courts have avoided a precise legal definition for the term "confidential relationship," they have discussed the type of evidence that will support the existence of a confidential relationship:

> Evidence of one party's deteriorated mental or physical condition will substantiate the existence of a confidential relationship as well as the ability of the dominant party to influence the weaker party.... The weaker party need not be legally insane.... Any condition rendering the weaker party unable to guard against the dominant party's imposition or undue influence is sufficient....
>
> Thus, the question to be answered is not whether the weaker party's decision was a good one, or even whether he knew what he was doing at the time. In these cases, the courts must determine whether the weaker party's decision was a free and independent one or whether it was induced by the dominant party.

***Williamson v. Upchurch***, 768 S.W.2d at 270 (citations omitted); ***accord Fritts v. Abbott***, 938 S.W.2d at 421.

In other words, there must be a showing that there were present the elements of dominion and control by the stronger over the weaker, or there must be a showing of senility or physical and mental deterioration of the donor, or other conditions which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor. ***Kelly v. Allen***, 558 S.W.2d 845, 848 (Tenn.1977); ***accord Fritts v. Abbott***, 938 S.W.2d at 420-21.

In addition to confidential relationship and the grantor's physical or mental deterioration, courts have noted other "suspicious circumstance" that are often relied upon to establish undue influence.  These include: (1) the beneficiary's active involvement in procuring the conveyance, ***see, e.g., Kelly v. Allen***, 558 S.W.2d 845, 848 (Tenn.1977); (2) secrecy concerning the existence of the conveyance; (3) the grantor's advanced age; (4) the lack of independent advice in preparing the instrument; (5) the unjust or unnatural nature of the instrument's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the instrument and the grantor's expressed intentions; and (8) fraud or duress directed toward the grantor. ***See Halle v. Summerfield***, 287 S.W.2d 57, 61-62 (Tenn. 1956)***; American Trust & Banking Co. v. Williams***, 225 S.W.2d 79, 85 (Tenn. 1948); ***see also*** 1 Pritchard on the Law of Wills and Administration of Estates § 145 (4th ed. 1983).

We have reviewed the entire record in this case and we find that the proof negates any conclusion that a confidential relationship, in the legal sense, existed between Blanche Gibson and Jimmy Gibson.  The proof does indicate that a normal mother-son relationship existed but, as noted

above, that relationship is not the same as the confidential relationship in law. Appellants assert that the fact that Jimmy Gibson controlled the day-to-day operations of the farm and the leasing agreements indicates that he exercised dominion and control over his elderly mother. We disagree. While it is undisputed that Jimmy Gibson had primary responsibility for the leases, such control over the operation of the farm does not evince a dominion and control over the person of Blanche Gibson. The record does not support a finding that, at the time the 1994 Quitclaim was executed, Jimmy Gibson exercised any "dominion or control" over the mental processes or physical actions of his mother. Dr. Cannon, who treated Blanche Gibson from 1989 until 1999, testified in relevant part as follows:

> Q. At that time [May 20, 1997] I didn't see any kind of notations or anything that the lady [Blanche Gibson] wasn't able to tell you [Dr. Cannon] what her problems were and talk to you.
>
> A. I specifically remember. This lady–I had taken care of her for quite some time and got to know her very well. And she was still very aware of her surroundings and able to be involved in decisions regarding her health care and other things.
>
> Q. That's in May of '97?
>
> A. May of '97.
>
> Q. What is your opinion as to whether or not that [sic] she was mentally alert and mentally capable of handling her own affairs at that time?
>
> A. That she was capable and competent.
>
> Q. Was there any period of time before that May of '97, from your recollection and from your office notes that you felt that the lady was not capable of handling her own affairs?
>
> A. No. She was stubborn but competent.

Although Blanche Gibson was of advanced age and was experiencing diminished health at the time of the execution of the 1994 Quitclaim, the evidence does not indicate that her condition was so advanced as to destroy her free agency.

The Appellants also assert that there are other "suspicious circumstances" from which the trial court should have found that Jimmy Gibson exercised undue influence over his mother. Appellants point to the fact that Jimmy Gibson attempted to purchase the Land from his mother in early 1994 at a price allegedly less than fair market value. This attempted purchase led to the Spring

1994 meeting at Union Savings Bank, at which Barnett Hall, Clyde Gibson, Jimmy Gibson, Bill Gibson and Blanche Gibson were all present. The record indicates that Blanche Gibson was advised of all of her options concerning the Land at this meeting and that she understood the advice. Consequently, Blanche Gibson understood in the Spring of 1994 that she did not have to sell the Land in order to service her indebtedness or to have funds on which to live. Bill Gibson testified, in relevant part, as follows concerning what information his mother gleaned from the Spring 1994 meeting at the bank:

> Q. ...You [Billy Gibson] told her [Blanche Gibson] that the bank was not going to take the farm; Hall told her the bank was not going to take the farm, correct?
>
> A. That's correct.
>
> Q. And you recommended to her–you persuaded her not to sell the farm to Jimmy Gibson, correct?
>
> A. I don't know if persuade is the right word. By showing her the facts, it was decided that [selling] wasn't the best–it wasn't [in] her best interest to do that.
>
> \*                           \*                           \*
>
> Q. What words did you tell her?
>
> A. Once it was brought out that the bank was not going to take the farm and that she could keep the farm and have income, she was okay with it.
>
> Q. I'm asking you what you told her, Mr. Gibson. What did you tell her? Did you tell her: You don't need to sell the farm to Jimmy? You don't have to sell the farm? What did you tell her?
>
> A. I told her she did not have to sell the farm because the bank was not going to take it, and "you can have an income off the rent."
>
> Q. You told her this. Now did Mr. Hall say anything like that to her?
>
> A. He confirmed that the bank was not going to take the farm away, there was no threat of the bank taking the farm away.
>
> \*                           \*                           \*

Q. ...[D]id she understand what you were telling her?

A. Yes, because I asked her was this [having the rental proceeds deposited directly to the bank to service her indebtedness and to give her some income] okay and she said, "Yes, this [rental income] is more than I've ever gotten."

Q. My question to you is: In your judgment, you made these statements to her, you explained all this to her according to what you're saying, and did she understand what you said to her?

A. I believe she did, yes.

Q. Did she understand what Mr. Hall said to her?

A. I believe she did, yes.

\*                                        \*                                        \*

Q. You think you had her convinced not to sell the farm, correct?

A. She felt like she did not have to sell the farm. She understood the facts, and due to that, she didn't have to sell the farm.

Q. She understood the facts, she understood exactly what you were telling her and what her rights were and all that, correct?

A. Right.

It was with this knowledge that Blanche Gibson executed the 1994 Quitclaim in October of that year. The fact that Blanche Gibson was aware of her options at the Spring 1994 meeting, and the fact that she made a decision at that time to deposit the Kelly family rent directly to the bank to service her debts and to provide her some income, negates the Appellants' claim that Jimmy Gibson fraudulently induced his mother to transfer the Land to him in October. Generally in an action for fraud, there must be proof of a false representation of an existing or past material fact. The false representation must have been made knowingly without belief in its truth or recklessly. Some person must have reasonably relied on it and suffered some damage as a result of the reliance. ***Pusser v. Gordon***, 684 S.W.2d 639 (Tenn. Ct. App.1984). Fraud involves deception and if one knows the truth, and is not deceived, he is not defrauded. ***Freeman v. Citizens' Nat'l Bank***, 167 Tenn. 399, 70 S.W.2d 25 (1934). The gravamen of fraud, then, is deception and, in the instant case, if any deception existed as to whether it was necessary for Blanche Gibson to divest herself of the Land, it was cleared up as early as Spring of 1994, which was well before the execution of the 1994 Quitclaim.

Appellants also contend that the trial court erred in finding that Blanche Gibson received independent advice before executing the 1994 Quitclaim. It is well settled that one way to prove the fairness of the transaction is to show that the grantor had the benefit of competent, independent advice on the advisability of making the gift or conveyance. ***Richmond v. Christian***, 555 S.W.2d 105, 107-08 (Tenn.1977). However, this advice need not be contemporaneous with or immediately preceding the gift or conveyance. ***Brown v. Weik***, 725 S.W.2d 938, 945 (Tenn. Ct. App.1983). In ***Turner v. Leathers***, 191 Tenn. 292, 232 S.W.2d 269 (1950), the Tennessee Supreme Court discussed the content and extent of independent advice necessary to overcome the presumption of invalidity:

> Proper independent advice in this connection means that the donor had the [preliminary] benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefactions.

***Id***. at 297-98, 232 S.W.2d at 271 (citations omitted). The rule of independent advice means that the adviser must not only be competent but independent. ***Id***. at 297, 232 S.W.2d at 271. Barnett Hall, who was present at the Spring 1994 meeting, testified, in relevant part, as follows:

> Q. Of course, as you [Mr. Hall] put it, you didn't have a dog in that fight [the dispute between Jimmy Gibson and the Appellants], you were independent, right? I mean, they [the Appellants] were saying that something was wrong and you were just representing the bank and you were just there as an independent?
>
> A. I guess the bank was my dog.
>
> Q. What I'm saying is, you weren't involved in the dispute between any of the Gibsons?
>
> A. No, no.
>
> Q. You were just independent from them, correct?
>
> A. Yes.
>
> Q. If I understand it, you talked with them and you explained to all of them there that they could work out some kind of deal where part of the money from the rent would be paid on the loan and part of it would go to Ms. Gibson; is that it?

A. Yes. I was interested in the loan getting paid, of course, and I mean, I can't tell you totally everything, but I think, you know, we were glad to do whatever that would help them all get satisfied.

Q. I understand. But what I'm saying is, you weren't taking a side of either of the problem?

A. No, sir.

Q. You were simply explaining it from an independent standpoint of what she could do if she wanted to take this rent and apply it to the loan, correct?

A. Yes, sir....

*                                    *                                    *

Q. You think she had a complete understanding of what you were talking about?

A. Yes, sir. It took her a little while.

Q. All right. But I'm just asking–it's pretty complex to me, too.

A. Uh-huh.

Q. But you think she understood what you were talking about?

A. Yes.

Although Blanche Gibson did not receive independent advice contemporaneous with the signing of the 1994 Quitclaim, the evidence is clear that she did receive independent advice in the Spring of 1994 from Barnett Hall and Bill Gibson. At the time of the signing of the 1994 Quitclaim, in October, Stacy Northcott testified that Blanche Gibson understood what she was signing, to wit:

Q. Okay. So you explained to her exactly what she was signing?

A. Yes, sir.

Q. Did she indicate to you that she understood it?

A. Yes, sir.

-11-

Q. Were you satisfied in your own mind that she did understand it?

A. Yes, sir.

Q. Did you explain what that meant by RESERVATION OF LIFE ESTATE?

A. Yes.

Q. And REMAINDER INTEREST, too?

A. Yes, sir.

Q. So you explained all that to her, and your best judgment, she understood it?

A. Yes, sir.

Q. And your best judgment, she was capable of signing that deed?

A. Yes, sir.

The evidence in record supports a finding that Blanche Gibson understood the nature of the transaction and was capable of executing the 1994 Quitclaim. The fact that Jimmy Gibson requested Mr. Acree's office to prepare the instrument is not extraordinary in the context of this record since Jimmy Gibson helped his mother in many of her financial and business transactions, a fact that Bill Gibson affirmed in his testimony: "Jimmy was always the one that took care of her, you know, the farm and the financial situation that she had." In terms of Jimmy Gibson's alleged secretiveness in having the 1994 Quitclaim executed, we find that the record does not support such a finding. The record indicates that Jimmy Gibson did not usually discuss any business concerning the Land with his siblings. He employed a local attorney to draft the deed and he recorded it the day after it was signed. When viewed in the context of the entire record, the evidence does not preponderate against the trial court's finding that Jimmy Gibson's actions surrounding the procurement of the 1994 Quitclaim are not so suspicious as to support a finding of undue influence.

For the foregoing reasons, we affirm the "Final Decree" of the trial court. Costs of this appeal are assessed to the Appellants, Bill Gibson, Clyde Gibson, Vivian Gibson Summar, Pam Gibson Clark, Robert J. Gibson, Jr., and their respective sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.