IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 25, 2007

# LILLIAN A. CARPENTER, ET AL. v. MICHAEL E. SIMS, ET AL.

### Appeal from the Circuit Court for Cumberland County
No. CV-3686     John Turnbull, Judge

---

### No. E2007-0622-COA-R3-CV  - FILED NOVEMBER 7, 2007

---

Beneficiaries under a will sought to rescind the sale of a condominium in which they asserted an inheritance interest upon allegations that 1) the consideration paid by the purchasers was so inadequate as to shock the conscience; 2) the purchasers exerted undue influence over the seller; and 3) the seller was mentally incompetent at the time of the sale.  Upon findings that the seller was mentally competent at the time of sale, that the purchasers did not exert undue influence over her, and that she had reason to sell the condominium for the amount she did, the trial court ruled that the sale of the condominium should not be set aside.  Upon our determination that the evidence does not preponderate against the trial court's conclusions, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Cause Remanded

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Charles G. Taylor III, Knoxville, Tennessee, for the appellants, Lillian A. Carpenter, Sarah P. Carpenter, Charles C. Carpenter, and Alma Bain Davis.

Harry D. Sabine, Crossville, Tennessee, for the appellees, Michael E. Sims and Linda S. Sims.

## OPINION

### I. Background

During June of 1994, Michael E. Sims and his wife, Linda S. Sims, residents of Ohio, were vacationing in a rental house in the Fairfield Glade subdivision of Crossville, Tennessee.  The Simses were interested in purchasing a home in Fairfield Glade and observed a "for sale" sign in the window of a condominium unit in the neighborhood.  The condominium was owned by Mary E.

Henderson, a 77 year old widow, and it had been her residence since she and her husband purchased it in 1982, although it had been vacant for approximately one year before the Simses discovered that it was for sale.

Seeking additional information about the condominium, Mrs. Sims called Ms. Henderson who was residing with friends in Knoxville at the time. Ms. Henderson advised Mrs. Sims that the condominium was not in very good condition and that she would like to sell it for $5,500. She told Ms. Sims that she would be glad to show the Simses the condominium, but that she did not want to drive to Crossville alone and asked if they would mind picking her up. The Simses agreed to do so, and during the drive to Crossville, Ms. Henderson commented that the condominium was "in pretty bad condition," that "there were a lot of things that needed to be done," and that "she hated it" and "was never coming back." She also indicated that she had listed the condominium with a realtor, but that "nobody was interested in it" and that she was "tired of making maintenance fee payments" on it.

Upon their arrival at Fairfield Glade, Ms. Henderson unlocked the door to the condominium, and she and the Simses went inside. Mr. Sims's undisputed testimony regarding the condition of the condominium when they entered was as follows:

> Q. Describe the condo when you got there, its condition.
>
> A. It was very bad. When we opened the door, the smell just about knocked us over.
>
> Q. What kind of a smell?
>
> A. Musty, moldy, mildew smell, mixed with that of decaying animals. [Ms. Henderson] had left some Decon mouse or rat poison. And there were a number of little animals that had died in the apartment, the skeletons of the little animals. I don't know if they were chipmunks or mice or various sizes. So the smell from those.
>
> At some point, the water heater had broken and had flooded the downstairs. She didn't say. I don't have any idea how long the water ran out onto the floor, but the whole downstairs had been flooded.
>
> The bottoms of the door casings were rotted and showed water damage. The carpet was so dark from mildew you could hardly see what color it was. There was mold and mildew growing up the walls four or five feet.
>
> Well, we subsequently found out that the bathtub leaked into the living room. The bathtub upstairs leaked down into the dining room.

2

When we first turned on the light in the dining area, I should say, the light was a ceiling fixture and it threw off sparks and smoked and everything like that, so we immediately turned it back off. Like I say there was just mold and mildew everywhere.

The carpet she said and it looked to be original from when they were built in the early 70's. There were stains in the ceiling where apparently the roof had leaked. And the one area in the back bedroom, the ceiling was crumbling. And that part of the ceiling butts up against the firewall. Between every other unit, there's a stone or a block firewall. And the blocks at the top where the ceiling met were rotting away or crumbling.

The sinks were all, the porcelain was chipping out of them. The sinks were rusted.

. . .

[T]he water heater had broken and it had flooded all over and they had turned off the water to it to keep it from, you know, flooding all over. But no attempt had ever been made, apparently to clean it up, because of all the mildew and the water damage that was apparent at the bottom of the baseboards and the bottom of the door casings and along the bottom of the paneling.

Mrs. Sims's testimony corroborated that of her husband:

[W]hen [Ms. Henderson] went in, she kicked . . . it was a dead chipmunk or a mouse or something out of the way.

. . .

[Mrs. Henderson] had packed her stuff in boxes. And it was obvious that water had come up, because they were all molded and falling apart. Cardboard boxes were just stacked everywhere. And there was this black, dirty mold on everything. And the smell was bad and there was holes in the wall. There was . . . It's undescribable. I mean, I had no interest in it at that point.

And [Ms. Henderson] was kind of telling us, "Well, we don't have any water, because the water heater busted. And all of this is because the water heater busted." She said, "So I had them turn off the water."

3

Well, there wasn't any water in there, but you could see where the water had come up on the boxes and stuff. So I don't know how long the water heater had been busted or anything about it, but there was no water. And it was real dark.

And I flipped on the light. There was a light switch on the wall. And when I did, just sparks and smoke flew from the ceiling light fixture thing. . . . I mean it was just . . . it was really, really bad. You couldn't stay in there very long.

. . .

And we went upstairs and there was a big mold spot on the ceiling up there. And behind the paneling, the actual block had had so much water come in that it was deteriorating. And again, there was just stuff stacked everywhere. The smell was really bad.

Both Mr. and Mrs. Sims testified that they were hesitant about purchasing the condominium because of its condition, but that, according to Mr. Sims, "we decided that we had more time than money. And you know, we could fix the things that were wrong with it slowly over time and not have to worry about the financing or whatever." Accordingly, after some further discussion, the Simses advised Ms. Henderson that they would accept her offer of sale.

An appointment was made with attorney Jim Thompson for the preparation of documents prerequisite to closing, and two days later, the Simses drove Ms. Henderson to Mr. Thompson's office where his staff prepared a deed and contract for sale of the condominium and agreed to conduct a title search on behalf of the Simses. Four days thereafter, on completion of the title search, Ms. Henderson and the Simses returned to Mr. Thompson's office, and the sale was closed. Afterwards, the Simses drove Ms. Henderson to her bank where she purchased a certificate of deposit with the sale proceeds.

In November of 1994, a complaint was filed in the Cumberland County Chancery Court by Lyn T. Hart as next friend of Ms. Henderson to rescind the contract for sale of the condominium to the Simses; however, this action was voluntarily dismissed without prejudice by order entered May 5, 2000. On June 13, 2002, and subsequent to the death of Ms. Henderson on November 17, 1996, suit to rescind the contract was filed in the Cumberland County Circuit Court by Ms. Henderson's sister, Helen Goans, as Ms. Henderson's sole heir. Among other things, this complaint alleged that following the death of her husband, Ms. Henderson "maintained the condominium in excellent condition and in June of 1994, it had a fair market value of between $40,000.00 and $50,000.00." The complaint further alleged that Ms. Henderson "lacked sufficient mental capacity" to execute the documents conveying the condominium to the Simses because she was suffering from advanced Alzheimer's disease at the time and that the Simses "were aware of Ms. Henderson's mental incapacity and used undue influence to induce her to sign the documents." Finally, the complaint alleged that "the $5,500.00 consideration paid by [the Simses] to Ms. Henderson represents only

approximately one tenth the fair market value of the condominium" and "[s]uch an amount is so grossly inadequate and unconscionable that it makes the contract and deed void *ab initio*."

Before the case was tried, Ms. Goans died, and by order of the court entered August 2, 2006, Charles C. Carpenter, Alma Bain Davis, Lilian A. Carpenter, and Sarah P. Carpenter[1] were substituted as parties plaintiff.

The case came on for non-jury trial on February 6, 2007, after which, on February 22, 2007, the trial court entered its final order in favor of the Simses upon its finding that Ms. Henderson was competent when she sold the condominium and understood what she was doing, and that she had her reasons for selling the condominium for $5,500. This appeal followed.

## II. Issue

The sole issue we address is whether the trial court erred in failing to rescind the sale of the condominium to the Simses because of a preponderance of evidence showing 1) that the consideration paid by the Simses was so inadequate as to shock the conscience, 2) that the Simses exerted undue influence over Ms. Henderson, or 3) that Ms. Henderson was mentally incompetent at the time of sale.

## III. Analysis

### A. Standard of Review

This is a non-jury case and, accordingly, our review is *de novo* upon the record of the trial court without any presumption of correctness attaching to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996) and Tenn. R. App. P. 13(d). We must, however, presume the trial court's factual findings to be correct absent evidence preponderating to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). "On an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990)(citing *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974)).

### B. Adequacy of Consideration

First, the appellants argue that the conveyance of the condominium should be set aside upon the ground that the consideration paid by the Simses was grossly inadequate. In support, the appellants assert that it is clear from the record that the condominium was worth many times the

---

[1]Charles Carpenter attested that these four individuals are beneficiaries under Helen Goans's will and thereby assert claims to any interest Ms. Goins might have had in the condominium.

$5,500 paid by the Simses, referencing evidence that 1) the condominium was purchased by Ms. Henderson and her husband in 1982 for $38,000; 2) the year before the sale, the condominium was appraised for tax purposes at $36,500; 3) the parties stipulated that, in 1994, condominiums at Fairfield Glade had a fair market value of between $20,000 to $42,500; and 4) fifteen years before the sale, Mrs. Sims paid $6,000 for an unimproved lot at Fairfield Glade. As supporting authority, the appellants cite **Stephens v. Ozbourne**, 64 S.W. 902 (Tenn. 1901) wherein the Tennessee Supreme Court noted that even in the absence of other circumstances, avoidance of a contract by rescission will be warranted "when the inadequacy of price is so gross that it shocks the conscience." The appellants contend that the evidence preponderates to the conclusion that the consideration paid by the Simses was so inadequate as to shock the conscience and compels rescission. We disagree.

In order to carry their burden of proof that the consideration paid for the condominium was grossly inadequate, the appellants were necessarily obliged to establish the condominium's fair market value at the time of sale. They did not do so. As to the appellants' attempt to establish fair market value by introducing the property's tax appraisal value, in Tennessee and elsewhere "[i]t is the overwhelming weight of authority that assessed value is not competent direct evidence of value for purposes other than taxation." C.C. Marvel, Annotation, *Valuation For Taxation Purposes to Show Value for Other Purposes,* 39 A.L.R.2d 209 (1955); *see also* **Knoxville Community Development Corp. v. Bailey**, No. E2004-10659-COA-R3-CV, 2005 WL 1457750, (Tenn. Ct. App. W.S., filed Feb. 18, 2005); **Union Joint Stock Land Bank of Louisville v. Knox County, et al.**, 97 S.W.2d 842 (Tenn. Ct. App. 1936). Furthermore, we have cited the Simses' uncontradicted testimony regarding the deplorable condition of the condominium at the time of sale, and it stands to reason that any evidence of fair market value that disregarded the deterioration the condominium suffered during the year preceding the sale would not have been competent to establish the fair market value of the condominium at the time of sale. The appellants introduced absolutely no evidence as to the fair market value of the condominium based upon its condition at the time of sale. In its memorandum opinion, the trial court correctly noted that neither the stipulation that other condominiums in the neighborhood were selling for between $20,000 and $42,000 nor the tax appraisal of $36,500 were based upon "the individual attributes of this particular apartment." As the trial court queried "[H]ow in the world can you tell what something is worth if you don't go inside of it?" Further, even if it were conceded that the consideration $5,500 paid by the Simses was inadequate, absent proof that it was *grossly* inadequate, the conveyance must stand undisturbed. As we recently restated in **In re Estate of Reynolds**, No. W2006-01076-COA-R3-CV, 2007 WL 2597623, at *14 (Tenn. Ct. App. W.S., filed Sept. 11, 2007):

> [W]here the parties contract with knowledge of what they are doing, inadequacy of consideration is no ground for avoiding a contract. **Farrell v. Third Nat'l Bank**, 20 Tenn. App. 540, 101 S.W.2d 158, 163 (1936). Courts are not at liberty to annul or change or amend a contract entered into by parties capable of contracting simply upon the ground that the judges may be of the opinion that a better agreement would or should have been arrived at. **Matthews v. Matthews**, 24 Tenn. App. 580, 148 S.W.2d 3, 13 (1940).

6

The record indicates that Ms. Henderson was intent on selling the condominium as soon as possible and had priced it to accomplish that goal. Attorney Jim Thompson's employees, Jean Brown and Pam Dearmon, both questioned Ms. Henderson about the sales price of $5,500 and testified that Ms. Henderson told them that her husband was dead and that she was tired of paying dues on the condominium and she "just wanted rid of it." Mr. Sims also testified that Ms. Henderson told him that even though she had not been living in the condominium for a year, "she continued to pay the maintenance fees and the electric, things like this, the insurance, property taxes. And she was on a fixed income and she just wanted to be out from under the burden of all these extra expenses. They came to about three hundred dollars a month." Mrs. Sims similarly testified that Ms. Henderson told her that "[s]he was tired of making payments on something she was never coming back to. And she told me, she said, 'This place is just rotting down.' She said, 'It just gets worse and worse and worse.'"

We are compelled to conclude that there was a failure of proof that the consideration paid by the Simses was so grossly inadequate as to shock the conscience, and we find no merit in the appellants' argument to the contrary.

### C. Undue Influence

Next, the appellants argue that the conveyance of the condominium should be rescinded upon the ground that the Simses exerted undue influence over Ms. Henderson.

"The doctrine of undue influence applies when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship." *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). As we noted in *Reynolds supra*, "the courts have never clearly defined what a confidential relationship is. In general terms, it is any relationship which gives one party dominion or influence over the other." *Id.* at 269 (citations omitted). In *Kelly v. Allen,* 558 S.W.2d 845 (Tenn. 1977), the Tennessee Supreme Court further stated that before a conveyance will be set aside upon grounds of undue influence,

> there must be a showing that there were present the elements of dominion and control by the stronger over the weaker, or there must be a showing of senility or physical and mental deterioration of the donor or that fraud or duress was involved, or other conditions *which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor.*

*Id.* at 848 (emphasis added). "[T]he question to be answered is not whether the weaker party's decision was a good one, or even whether he knew what he was doing at the time. In these cases, the courts must determine whether the weaker party's decision was a free and independent one or whether it was induced by the dominant party." *Williamson v. Upchurch*, 768 S.W.2d 265, 270

(Tenn. Ct. App. 1988).

The appellants contend that in order to exert influence over Ms. Henderson, the Simses intentionally established a confidential relationship with Ms. Henderson by various means, including the following:

> On the first occasion when they met her, Mr. Sims told Ms. Henderson that he had once been a deputy sheriff in order to gain her trust. Later, while waiting for the closing to occur, the defendants tried to prevent Ms. Henderson from changing her mind regarding the sale by monopolizing her time. Even though there was no need to see her again prior to closing, the defendants nevertheless made an effort to visit and spend time with Ms. Henderson practically every day. During that period, they took her out to eat numerous times. They helped her move items into storage and took her to the bank and to the grocery store.

The appellants do not, and reasonably cannot, contend that the sales price of $5,500 was the result of undue influence by the Simses, as the only evidence presented regarding establishment of the sale price shows that such price was originally proposed by Ms. Henderson upon first being telephoned by Mrs. Sims, at which time Ms. Henderson had not yet met the Simses and knew nothing about them. Rather, it appears that the appellants argue that but for the alleged undue influence of the Simses between the time of their initial meeting with Ms. Henderson and closing of the sale six days later, Ms. Henderson would have changed her mind and that she would have either increased the asking price or decided not to sell. We do not agree that the evidence preponderates to this conclusion.

The referenced actions of the Simses alone do not mandate the conclusion that they were prompted by the ulterior motive of preventing Ms. Henderson from changing her mind regarding the terms of the sale. The Simses presented testimony that they did, in fact, have other reasons for their actions. Mr. Sims attested that when he and his wife met Mrs. Henderson to drive her to the condominium, he showed her his deputy sheriff identification card "to ease her mind that we weren't some stalkers or something like that that was going to spirit her away and do her ill." Mr. Sims further explained the reason he and his wife subsequently spent additional time with Ms. Henderson as follows:

> She was simply a lonely little old lady. And my wife is very kind hearted. And well, I tend to be a little bit myself, but not nearly much though as she. And I felt sorry for her. She didn't have any family around, according to what she said. She said she had some stepchildren, but she hadn't seen them in a number of years. She said didn't get along with her sister. She said she had no other relatives. And we felt sorry for her, so we were just trying to make her feel

good.

The record also shows that some of the Simses' actions that the appellants argue were calculated to sway Ms. Henderson from changing her mind regarding the sale actually did not occur until *after* the sale was closed. This belies the appellants' undue influence argument and is consistent with the Simses' assertion that they were simply motivated by good will. In this regard, we note the following testimony of Mr. Sims upon cross-examination:

> Q. And in fact, *after you closed the transactions and she signed the deed*, you actually helped her take what was left of her furniture and move it out and put it in a storage area. Right?
>
> A. Yes. There was quite a bit of it.
>
> . . .
>
> Q. *After she signed the deed*, then you took her to the First National Bank in Crossville so that she could take that fifty-five hundred dollars and buy a certificate of deposit. Right?
>
> A. That was her desire, yes, sir.
>
> . . .
>
> Q. How long did you continue to see Mrs. Henderson *after you purchased her condo*?
>
> A. One to two weeks, I would guess.
>
> Q. Did you continue to take her out to eat a lot?
>
> A. We did several times, yes, sir.
>
> . . .
>
> Q. You would agree, would you not, that during this period she was very dependent upon you and your family?
>
> A. I wouldn't say necessarily dependent. We developed a friendship. No more so than any friend would be dependent on another. We helped her get around.

(Emphasis added).

9

Ms. Sims further testified that she did not become friends with Ms. Henderson "until after this was all over and done with. After the final papers were signed, that's when I became close to her." Obviously, once the deal was closed, the Simses had no reason to exert influence over Ms. Henderson regarding the terms of sale. The appellants have presented no evidence that Ms. Henderson's "free agency was destroyed" and that the will of the Simses "was substituted therefor." Based upon the record presented, we find no merit in the appellants' argument that the sale should have been rescinded because of undue influence by the Simses.

### D. Mental Incompetence

Finally, the appellants contend that the conveyance of the condominium should have been rescinded upon the ground that Ms. Henderson was mentally incompetent at the time of the sale.

It is well-settled in Tennessee and elsewhere that a conveyance is deemed invalid upon satisfactory proof that the grantor did not have the mental capacity to understand what he or she was doing at the time of contract. "In order for a deed to be valid, it must be the conscious, voluntary act of the grantor and a deed executed when the grantor is mentally unbalanced, when he has no intelligent comprehension of the act being performed and when he is incapable of transacting is void." *Brown v. Weik*, 725 S.W.2d 938, 944 (Tenn. Ct. App. 1983)(citing *Hinton v. Robinson*, 364 S.W.2d 97, 100 (Tenn. Ct. App. 1962)). In a later opinion of this Court, *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291 (Tenn. Ct. App. 2001), we elaborated on this subject as follows:

> Competency to contract does not require an ability to act with judgment and discretion. All that is required is that the contracting party reasonably knew and understood the nature, extent, character, and effect of the transaction. Thus, persons will be excused from their contractual obligations on the ground of incompetency only when (1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) when they are unable to act in a reasonable manner in relation to the transaction, and the other party has reason to know of their condition. Restatement (Second) of Contracts § 15(1) (1981).
>
> All adults are presumed to be competent enough to enter into contracts. Accordingly, persons seeking to invalidate a contract for mental incapacity have the burden of proving that one or both of the contracting parties were mentally incompetent when the contract was formed. It is not enough to prove that a person was depressed or had senile dementia. To prove mental incapacity, the person with the burden of proof must establish, in light of all the surrounding facts and circumstances, that the cognitive impairment or disease rendered the contracting party incompetent to engage in the transaction at issue according to the standards set forth above.

*Id.* at 297 (citations omitted).

The appellants maintain that the evidence presented at trial proved that Ms. Henderson experienced "a steady and progressive loss of mental capacity" due to the fact that she was suffering from Alzheimer's disease and necessitates the conclusion that on the day she signed the deed to the condominium, she lacked the mental capacity to understand what she was doing and the consequences of her action. We disagree.

In support of their allegations that Ms. Henderson was suffering from Alzheimer's disease when she conveyed the condominium to the Simses, the appellants rely on the testimony of James Joseph Kennedy, M.D., a psychiatrist who first saw Ms. Henderson in April and May of 1996 and attested that at that time, he determined that she probably had Alzheimer's disease or primary dementia of the Alzheimer's type and had suffered from the disease for four to five years. However, upon cross-examination, Dr. Kennedy conceded that he had not examined Ms. Henderson at the time of the transaction with the Simses and did not know what her condition was at that time. Dr. Kennedy also admitted that it is possible that Ms. Henderson was able to manage her affairs in 1994 and indicated that the rate at which Alzheimer's progresses varies from person to person, stating "[e]verybody is different" in that regard. The appellants also aver to a medical report prepared by Dr. Arlene J. Donowitz in early January of 1994 when Ms. Henderson was admitted to Parkridge Hospital for pneumonia and note that the report describes Ms. Henderson as "slightly demented." However, in deposition testimony Ms. Goans, who was with Ms. Henderson at the time this examination, stated that Dr. Donowitz said that Ms. Henderson was "a little bit hazy," but that she "didn't know if it was her temperature or if there was a problem." The appellants also submitted a medical report prepared by Dr. Marye Lois McCroskey in September of 1994 stating that Ms. Henderson exhibited memory lapses and "lacked the comprehensive reasoning of other persons her age" and that a conservator should be appointed to make decisions concerning "her long-term health care and probably financial care." However, this report does not prove Ms. Henderson's mental capacity at the time of contract, nor does it show that she did not understand the nature and consequences of her sale of the condominium to the Simses. Moreover, the report specifically states that at the time of the report, Ms. Henderson was able to "focus on the present."

Even if Ms. Henderson suffered from some degree of dementia at the time she sold the condominium to the Simses, it does not follow from that fact alone that she did not have the mental capacity to engage in such transaction. As we noted in *Rawlings*, in establishing incompetence to contract, it is not enough to show that a person has senile dementia, but it must be shown that such person was not able to understand the consequences of his or her actions. Other evidence presented at trial supported the trial court's determination that Ms. Henderson was mentally competent to convey her condominium to the Simses in June of 1994. Mr. Sims testified that Ms. Henderson was "a very sharp lady," and he noted that when he observed her writing a check "she would immediately write it down, what the check was for and subtract it out and, you know, balance her checkbook right there." Ms. Sims testified that Ms. Henderson was "a very smart lady" and that nothing Ms. Henderson said or did raised any doubt as to her competence. Attorney Jim Thompson's legal secretary, Barbara Jena Brown, testified that, in accord with Mr. Thompson's office policy, she has

11

turned people away when it appears that they are not competent. Ms. Brown attested that when Ms. Henderson and the Simses came to the office, Ms. Henderson had brought tax cards pertaining to the condominium, that she spoke with Ms. Henderson for several minutes about the terms of the sale and that in her opinion, Ms. Henderson was competent and that "it never entered [her] mind that there was any problem." Mr. Thompson's other employee, Pam Dearmon, also sat down and spoke with Ms. Henderson and attested that Ms. Henderson gave her no reason to question her competence. Even Ms. Goans testified that on "some days [Ms. Henderson] would be more with it than other days" and admitted that she could not say whether Ms. Henderson would have been "with it" when she elected to continue with the sale of her condominium.

Upon careful review of the entire record in this case, it is our determination that the evidence does not preponderate against the trial court's decision that Ms. Henderson was competent when she sold her condominium to the Simses.

### *E. Standing*

We acknowledge the Simses' argument that the appellants did not have standing in this case; however, in light of our decision herein, we need not address that issue.

### *IV. Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of appeal are assessed to the appellants, Lillian A. Carpenter, Sarah P. Carpenter, Charles C. Carpenter, and Alma Bain Davis.

_____

SHARON G. LEE, JUDGE